# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| LOUISIANA DEPARTMENT OF | ) |
| ENVIRONMENTAL QUALITY, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | )      Civil Action No. 09-100-JJB-RLB |
| | ) |
| LOUISIANA GENERATING LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CONSENT DECREE

## TABLE OF CONTENTS

I. JURISDICTION AND VENUE..........................................................................................3

II. APPLICABILITY...........................................................................................................3

III. DEFINITIONS..............................................................................................................4

IV. NO$_x$ EMISSION REDUCTIONS AND CONTROLS................................................ 11

V. SO$_2$ EMISSION REDUCTIONS AND CONTROLS..................................................15

VI.  PM EMISSION REDUCTIONS AND CONTROLS ....................................................19

VII. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED
CONTROLS.........................................................................................................24

VIII. ENVIRONMENTAL MITIGATION PROJECTS.......................................................25

IX. CIVIL PENALTY.........................................................................................................27

X. RESOLUTION OF CERTAIN CIVIL CLAIMS OF THE PLAINTIFFS.......................28

XI. PERIODIC REPORTING.............................................................................................29

XII. REVIEW AND APPROVAL OF SUBMITTALS.........................................................30

XIII. STIPULATED PENALTIES.......................................................................................31

XIV. FORCE MAJEURE................................................................................................... 41

XV. DISPUTE RESOLUTION.......................................................................................... 45

XVI. PERMITS..................................................................................................................47

XVII. INFORMATION COLLECTION AND RETENTION...............................................49

XVIII. NOTICES................................................................................................................51

XIX. SALES OR TRANSFERS OF OWNERSHIP INTERESTS.......................................53

XX. EFFECTIVE DATE.....................................................................................................54

XXI. RETENTION OF JURISDICTION.............................................................................54

XXII. MODIFICATION...................................................................................................55

XXIII. GENERAL PROVISIONS...................................................................................55

XXIV. SIGNATORIES AND SERVICE.........................................................................58

XXV. PUBLIC COMMENT............................................................................................58

XXVI. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE........59

XXVII. FINAL JUDGMENT...........................................................................................60

WHEREAS, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint on February 11, 2009, against Louisiana Generating LLC ("Louisiana Generating" or "Settling Defendant") pursuant to Sections 113(b) and 167 of the Clean Air Act ("the Act"), 42 U.S.C. §§ 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92; the federally approved Louisiana PSD regulations of the Louisiana State Implementation Plan ("SIP"); Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally approved Louisiana Title V program, or any rule or permit issued thereunder ("Title V");

WHEREAS, the Louisiana Department of Environmental Quality ("LDEQ") filed a complaint on February 18, 2010, pursuant to Section 304 of the Act, 42 U.S.C. § 7604, alleging the same violations as are alleged in the United States' complaint;

WHEREAS, EPA issued notices of violation ("NOVs") to Louisiana Generating with respect to such allegations on February 15, 2005, and December 8, 2006;

WHEREAS, in their complaints, the United States and LDEQ ("Plaintiffs") allege, inter alia, that Louisiana Generating is responsible for the modification and operation of two electric generating units (Units 1 and 2) at the Big Cajun II Power Plant ("Big Cajun II"), located near New Roads, Louisiana, without necessary permits, and without installing and employing the best available control technology ("BACT") to control emissions of nitrogen oxides ("$NO_x$") and/or sulfur dioxide ("$SO_2$") as the Act requires;

WHEREAS, the Settling Defendant denies that it is responsible for or committed violations of the Clean Air Act or that the projects performed at Big Cajun II required a PSD permit or the installation of BACT;

WHEREAS, Plaintiffs' complaints alleges claims upon which relief can be granted against the Settling Defendant under Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604;

WHEREAS, the United States provided the Settling Defendant and the State of Louisiana with actual notice of alleged violations in accordance with Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1);

WHEREAS, the United States, LDEQ, and the Settling Defendant ("Parties") have agreed that settlement of this action is in the best interest of the Parties and in the public interest, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter;

WHEREAS, the Settling Defendant affirms that a portion of the emissions technology, including related to PM emissions and refueling, under this consent decree, will allow it to comply with the Mercury Air Toxics Rule, a change in environmental law promulgated after the filing of the complaint;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length and that this Consent Decree is fair, reasonable, consistent with the goals of the Act, and in the public interest;

WHEREAS, the Settling Defendant has cooperated in the resolution of this matter;

WHEREAS, the Settling Defendant maintains that it has been and remains in compliance with the Act and is not liable for civil penalties or injunctive relief, and nothing herein shall constitute an admission of liability; and

WHEREAS, the Parties have consented to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and pursuant to Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c).  The Settling Defendant consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than the Parties to this Consent Decree.  Except as provided in Section XXV (Public Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II. APPLICABILITY

2.  Upon entry, the provisions of this Consent Decree shall apply to and be binding upon and inure to the benefit of Plaintiffs and the Settling Defendant, and their successors and assigns, and upon their officers, employees and agents solely in their capacities as such.

3.  The Settling Defendant shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or other organization retained to perform any of the work required by this Consent Decree.  Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, the Settling Defendant shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, the Settling Defendant shall not assert as a defense the failure of their officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless the Settling Defendant establishes that such failure resulted from a Force Majeure Event, as defined in Section XIV of this Consent Decree.

### III.  DEFINITIONS

4.  Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree and, except as otherwise provided in this Consent Decree, every other term used in this Consent Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Consent Decree what such term means under the Act or those implementing regulations.

5.  A "30-day Rolling Average Emission Rate" for a Unit means, and shall be expressed as, a lb/mmBTU rate calculated in accordance with the following procedure:  first, sum the total pounds of the pollutant in question emitted from the Unit during an Operating Day and the previous twenty-nine (29) Operating Days;  second, sum the total heat input to the Unit in mmBTU during the Operating Day and during the previous twenty-nine (29) Operating Days; and third, divide the total number of pounds of pollutants emitted during the thirty (30)

-4-

Operating Days by the total heat input during the thirty (30) Operating Days. A new 30-Day Rolling Average Emission Rate shall be calculated for each new Operating Day. Each 30-Day Rolling Average Emission Rate shall include all emissions that occur during all periods within any Operating Day, including emissions from startup, shutdown, and Malfunction, except as otherwise provided by Section XIV (Force Majeure).

6. "Big Cajun II" means Units 1, 2 and 3 of the Big Cajun II Power Station located near New Roads, Louisiana.

7. "CEMS" or "Continuous Emission Monitoring System," means, for obligations involving $NO_x$ and $SO_2$ under this Consent Decree, the devices defined in 40 C.F.R. § 72.2, and installed and maintained as required by 40 C.F.R. Part 75.

8. "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

9. "Consent Decree" means this Consent Decree.

10. "Continuously Operate" or "Continuous Operation" means that when a Dry FGD, DSI, SNCR, LNB, OFA, or ESP is used at a Unit, except during a Malfunction, such control shall be operated at all times the Unit is in operation, consistent with the technological limitations, manufacturers' specifications, and good engineering and maintenance practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit.

11. "Date of Entry" means the date this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

12. "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Middle District of Louisiana.

13. "Day" means calendar day, unless otherwise specified.

14. "Dry Flue Gas Desulfurization" or "Dry FGD" means an add-on air pollution control system for the reduction of $SO_2$ located downstream of a boiler that sprays an alkaline sorbent slurry in one or more absorber vessels designed to provide intimate contact between an alkaline slurry and the flue gas stream to react with and remove $SO_2$ from the exhaust stream forming a dry powder material which is captured in a downstream particulate control device.

15. "Dry Sorbent Injection" or "DSI" means a process in which a sorbent is injected into the downstream boiler exhaust prior to the particulate air pollution control system.

16. "Electrostatic Precipitator" or "ESP" means a device for removing particulate matter from combustion gases by imparting an electric charge to the particles and then attracting them to a metal plate or screen of opposite charge before the combustion gases are exhausted to the atmosphere.

17. "Emission Rate" for a given pollutant means the number of pounds of that pollutant emitted per million British thermal units of heat input (lb/MMBtu), measured in accordance with this Consent Decree.

18. "EPA" means the United States Environmental Protection Agency.

19. "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, or natural gas.

20. "lb/MMBtu" means one pound of a pollutant per million British thermal units of heat input.

21. "Low $NO_x$ Burner" or "LNB" means commercially available combustion modification technology that minimizes $NO_x$ formation by introducing coal and combusting air into a boiler

-6-

such that initial combustion occurs in a manner that promotes rapid coal devolatilization in a fuel-rich (*i.e.*, oxygen deficient) environment and introduces additional air to achieve a final fuel-lean (*i.e.*, oxygen rich) environment to complete the combustion processes.

22. "LDEQ" means the Louisiana Department of Environmental Quality.

23. "Malfunction" means malfunction as that term is defined under 40 C.F.R. § 60.2.

24. "MW" means a megawatt or one million Watts.

25. "National Ambient Air Quality Standards" or "NAAQS" means national ambient air quality standards promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

26. "Natural Gas" means natural gas received directly or indirectly through a connection to an interstate pipeline transporting natural gas governed by a tariff approved by the Federal Energy Regulatory Commission. The Parties recognize that Natural Gas is expected to contain no more than 0.5 grains of sulfur per 100 standard cubic feet of gas.

27. "Nonattainment NSR" means the new source review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515 and 40 C.F.R. Part 51, and corresponding provisions of the federally enforceable Louisiana SIP.

28. "$NO_x$" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

29. "$NO_x$ Allowance" means an authorization to emit a specified amount of $NO_x$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or applicable State Implementation Plan; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2011, a "$NO_x$ Allowance" shall include an allowance created and allocated to Big Cajun II under

such program only for compliance periods starting on or after the fourth anniversary of the date
as of which emissions are first subject to such program.

30. "Operating Day" means any calendar day on which a Unit fires fossil fuel.

31. "Over Fire Air" or "OFA" mean an in-furnace staged combustion control to reduce $NO_x$
emissions.

32. "Ownership Interest" means part or all of Settling Defendant's legal or equitable
ownership interest in Big Cajun II.

33.  "Parties" means the United States, LDEQ, and the Settling Defendant.  "Party" means
one of the named "Parties."

34. "Plant-Wide Annual Tonnage Limitation" means the limitation, as specified in this
Consent Decree, on the number of tons of pollutant ($SO_2$ or $NO_x$) that may be emitted from the
respective facility during the relevant calendar year (*i.e.*, January 1 through December 31), and
shall include all emissions of the specified pollutant that occur during all periods of operation,
including startup, shutdown, and Malfunction

35. "PM" means total filterable particulate matter, measured in accordance with the
provisions of this Consent Decree.

36. "PM CEMS" or "PM Continuous Emission Monitoring System" means, for obligations
involving the monitoring of PM emissions under this Consent Decree, the continuous emission
monitors installed and maintained as described in 40 C.F.R. § 63.10010 and 40 C.F.R. §
60.49Da(v).

37. "Prevention of Significant Deterioration" or "PSD" means the prevention of significant
deterioration of air quality program under Part C of Subchapter I of the Clean Air Act, 42 U.S.C.

-8-

§§ 7470 - 7492, and 40 C.F.R. Part 52, and corresponding provisions of the federally enforceable Louisiana SIP.

38. "Project Dollars" means Settling Defendant's expenditures and payments incurred or made in carrying out the Environmental Mitigation Projects identified in Section VIII (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section VIII (Environmental Mitigation Projects) and Appendix A of this Consent Decree, and (b) constitute Settling Defendant's direct payments for such projects, or Settling Defendant's external costs for contractors, vendors, and equipment.

39. "Refuel to Natural Gas" or "Refueled to Natural Gas" means, solely for purposes of this Consent Decree, the modification of a unit such that the modified unit generates electricity solely through the combustion of Natural Gas rather than coal, including installation of the following combustion controls to reduce emissions of $NO_x$: low- $NO_x$ natural gas burners, SNCR, and an overfire air system.  Nothing herein shall prevent the reuse of any equipment from Big Cajun II Unit 2 at any other existing unit or new emissions unit, provided that Settling Defendant applies for, and obtains, all required permits, including, if applicable, a PSD or Nonattainment NSR permit.

40. "Repowers" or "Repowered" means, solely for purposes of this Consent Decree, the removal and replacement of the Unit components such that the replaced unit generates electricity solely through the combustion of Natural Gas rather than coal, through the use of a combined cycle combustion turbine technology.

41. "Retire" means to permanently shut down a Unit such that the Unit cannot physically or legally burn coal, and to comply with applicable state and federal requirements for permanently ceasing operation of the Unit as a coal-fired electric generating Unit, including removing the Unit from Louisiana's air emissions inventory, and withdrawing and/or amending all applicable permits so as to reflect the permanent shutdown status of such Unit.

42. "Retrofit" means that the Unit must install and Continuously Operate a Dry FGD or equivalent pollution control technology approved in accordance with the requirements of Paragraph 63 of this Consent Decree.

43. "Selective Non-Catalytic Reduction" or "SNCR" means a pollution control device for the reduction of $NO_x$ emissions that utilizes ammonia or urea injection into the boiler.

44. "Settling Defendant" means Louisiana Generating LLC.

45. "$SO_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

46. "$SO_2$ Allowance" means an authorization to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or applicable State Implementation Plan; provided, however, that with respect to any such program that first applies to emissions occurring after December 31, 2011, an "$SO_2$ Allowance" shall include an allowance created and allocated to Big Cajun II under such program only for compliance periods starting on or after the fourth anniversary of the date as of which emissions are first subject to such program.

47. "State Implementation Plan" or "SIP" means regulations and other materials promulgated by a state for purposes of meeting the requirements of the Clean Air Act that have been approved by EPA pursuant to Section 110 of the Act, 42 U.S.C. § 7410.

48. "Surrender" means, with regard to $SO_2$ and $NO_x$ Allowances, complying with the procedures set forth herein for permanently surrendering Allowances from the accounts administered by EPA and/or Louisiana, so that such Allowances can never be used to meet any compliance requirement under the Clean Air Act or a State Implementation Plan.

49. "Title V Permit" means the permit required for Big Cajun II under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

50. "Unit" means, for the purposes of this Consent Decree, collectively, the coal crusher, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment and systems necessary for the production of electricity. An electric utility steam generating station may comprise one or more Units.

## IV.  $NO_x$ EMISSION REDUCTIONS AND CONTROLS

### A.  $NO_x$ Emission Limitations and Control Requirements

#### 1.  Unit-Specific SNCR Installations and Performance Requirements

51. Settling Defendant shall install and Continuously Operate SNCR technology at Big Cajun II Unit 1, Unit 2, and Unit 3, by no later than the dates specified in the table below. Commencing no later than 30 Operating Days thereafter, Settling Defendant shall Continuously Operate such SNCR and existing LNB and OFA so that each Unit achieves and maintains a 30-

Day Rolling Average Emission Rate for NO$_x$ of no greater than the following: (a) for Unit 1: 0.150 lb/mmBTU, (b) for Unit 2: 0.150 lb/mmBTU, and (c) for Unit 3: 0.135 lb/mmBTU.

| Units | Date of Continuous Operation |
|---|---|
| SNCR at Unit 1 | May 1, 2014 |
| SNCR at Unit 2 | May 1, 2014 |
| SNCR at Unit 3 | May 1, 2014 |

### B.  Annual Tonnage Limitations for NO$_x$ Emissions

52. During each calendar year specified in the table below and continuing thereafter, actual total emissions of NO$_x$ from Big Cajun II shall not exceed the Plant-Wide Annual Tonnage Limitations specified below:

| Calendar Year | Plant-Wide Annual Tonnage Limitations for NO$_x$ |
|---|---|
| 2013 | 12,600 tons |
| 2014 | 12,600 tons |
| 2015 and each year thereafter | 8,950 tons |

### C.  General NO$_x$ Provisions

53. In determining emission rates for NO$_x$, Settling Defendant shall use CEMS in accordance with the reference methods specified in 40 C.F.R. Part 75.

### D.  Use and Surrender of NO$_x$ Allowances

54. Except as may be necessary to comply with Section XIII (Stipulated Penalties), Settling Defendant shall not use NO$_x$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation or the Plant-Wide Annual Tonnage Limitation, by using, tendering, or otherwise applying NO$_x$ Allowances to achieve compliance or offset any emissions above the limits specified in this Consent Decree.

55. Except as provided in this Consent Decree, Settling Defendant shall not sell, trade, or transfer any NO$_x$ Allowances allocated to Big Cajun II Units 1 or 2, or Settling Defendant's pro rata ownership share (58%) of any NO$_x$ Allowances allocated to Big Cajun II Unit 3, that would otherwise be available for sale, trade, or transfer as a result of the actions taken by Settling Defendant to comply with the requirements of this Consent Decree.

56. NO$_x$ Allowances allocated to Big Cajun II Units 1 or 2, or Settling Defendant's pro rata ownership share (58%) of any NO$_x$ Allowances allocated to Big Cajun II Unit 3, may be used by Settling Defendant only to meet its own federal and/or state Clean Air Act regulatory requirements for Big Cajun II.  Beginning in calendar year 2013, and continuing each calendar year thereafter, Settling Defendant shall Surrender all NO$_x$ Allowances allocated to Settling Defendant for Big Cajun II for that calendar year that Settling Defendant does not need in order to meet its own federal and/or state Clean Air Act regulatory requirements for Big Cajun II.

57. Nothing in this Consent Decree shall prevent Settling Defendant from purchasing or otherwise obtaining NO$_x$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.

-13-

58. The requirements in this Consent Decree pertaining to the Defendant's use of $NO_x$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree. These provisions shall survive any termination of this Consent Decree.

### E. Super-Compliant $NO_x$ Allowances

59. Notwithstanding Paragraphs 55 and 56, nothing in this Consent Decree shall preclude Settling Defendant from selling, banking, trading, or transferring $NO_x$ Allowances allocated to Big Cajun II that become available solely as a result of:

      a.      the installation and operation of any $NO_x$ pollution control technology or technique at Big Cajun II that is not otherwise required by this Consent Decree; or

      b.      achievement and maintenance of an Emission Rate below an applicable 30-Day Rolling Average $NO_x$ Emission Rate,

provided that Settling Defendant also is in compliance for that calendar year with all emission limitations for $NO_x$ set forth in this Consent Decree. Settling Defendant shall timely report the generation of such super-compliant $NO_x$ Allowances in accordance with Section XI (Periodic Reporting) of this Consent Decree.

### F.     Method for Surrender of $NO_x$ Allowances

60. Settling Defendant shall Surrender all $NO_x$ Allowances required to be Surrendered pursuant to Paragraph 56 by March 1 of the immediately following calendar year.

61. For all $NO_x$ Allowances required to be Surrendered to EPA, the Settling Defendant shall first submit a $NO_x$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $NO_x$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing.

-14-

Such $NO_x$ Allowance transfer requests may be made in an electronic manner using the EPA's Clean Air Markets Division Business System or similar system provided by EPA. As part of submitting these transfer requests, the Settling Defendant shall irrevocably authorize the transfer of these $NO_x$ Allowances and identify – by name of account and any applicable serial or other identification numbers or station names – the source and location of the $NO_x$ Allowances being Surrendered.

## V.  SO₂ EMISSION REDUCTIONS AND CONTROLS

### A.  SO₂ Emission Limitations and Control Requirements

#### 1.  Unit-Specific DSI Installation and Performance Requirements at Unit 1

62. Settling Defendant shall install and Continuously Operate DSI at Big Cajun II Unit 1 by no later than April 15, 2015. Commencing no later than thirty (30) Operating Days thereafter, and continuing until Retirement, Refueling, Repowering, or Retrofit pursuant to the following Paragraph 63, Settling Defendant shall Continuously Operate such DSI so that Unit 1 achieves and maintains a 30-Day Rolling Average Emission Rate for $SO_2$ of no greater than 0.380 lb/mmBTU.

63. Settling Defendant shall Retire, Refuel, Repower, or Retrofit Big Cajun II Unit 1 by no later than April 1, 2025. No later than December 31, 2022, Settling Defendant shall elect in writing to Plaintiffs which option -- Retire, Refuel, Repower, or Retrofit – it elects for Big Cajun II Unit 1. If Settling Defendant Retrofits Big Cajun II Unit 1, then commencing no later than thirty (30) Operating Days following March 30, 2025, Settling Defendant shall Continuously Operate Dry FGD or an alternate equivalent pollution control technology approved by EPA pursuant to Section XII (Review and Approval of Submittals) so that Unit 1 achieves and

maintains a 30-Day Rolling Average Emission Rate for $SO_2$ of no greater than the lower of (a) 0.070 lb/mmBTU, or (b) the average emission rate of the lowest three (3) BACT emission rates listed in the EPA RACT/BACT/LAER Clearinghouse (RBLC) (http://cfpub.epa.gov/RBLC) as of January 1, 2021, for retrofit $SO_2$ emission controls applied to any boiler burning sub-bituminous coal and using Dry FGD or the same alternate pollution control technology approved by EPA as contemplated in this Paragraph.  This analysis shall be submitted to Plaintiffs on the date Settling Defendant submits the permit application for the Dry FGD or the same alternate pollution control technology approved by EPA as contemplated under this Paragraph or December 31, 2022, whichever is sooner.  If Settling Defendant Repowers Unit 1,  Settling Defendant shall apply for, and obtain, all required CAA permit(s) for the Repowered Unit 1, including any appropriate PSD or NNSR permit.

## 2. Refuel Unit 2

64. Settling Defendant shall Refuel Big Cajun II Unit 2 by no later than April 15, 2015. Settling Defendant shall apply for, and obtain, all required CAA permit(s) for the Refueled Unit 2, including any appropriate PSD or NNSR permit.

## 3. Other $SO_2$ Measures

65. Commencing January 1, 2013, and continuing thereafter, Settling Defendant shall burn only coal with no greater sulfur content than 0.45 percent by weight at Big Cajun II Units 1 and 3.  The sulfur content shall be determined, and records shall be maintained, in accordance with required procedures within Louisiana permits for Units 1 and 3.

## B. **Annual Tonnage Limits for SO₂ Emissions**

66. During each calendar year specified in the table below and continuing thereafter, actual total emissions of $SO_2$ from Big Cajun II shall not exceed the Plant-Wide Annual Tonnage Limitation specified below:

| Calendar year | Plant-Wide Annual Tonnage Limitations for $SO_2$ |
|---|---|
| 2013 | 38,000 tons |
| 2014 | 38,000 tons |
| 2015 | 33,000 tons |
| 2016 and each year thereafter | 18,950 tons |

## C. **General SO₂ Provisions**

67. In determining Emission Rates for $SO_2$, the Settling Defendant shall use CEMS in accordance with those reference methods specified in 40 C.F.R. Part 75.

## D. **Use and Surrender of SO₂ Allowances**

68. Except as may be necessary to comply with Section XIII (Stipulated Penalties), Settling Defendant shall not use $SO_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation or the Plant-Wide Annual Tonnage Limitation, by using, tendering, or otherwise applying $SO_2$ Allowances to achieve compliance or offset any emissions above the limits specified in this Consent Decree.

69. Except as provided in this Consent Decree, Settling Defendant shall not sell, trade, or transfer any $SO_2$ Allowances allocated to Big Cajun II Units 1 or 2, or Settling Defendant's pro

-17-

rata ownership share (58%) of any $SO_2$ Allowances allocated to Big Cajun II Unit 3, that would otherwise be available for sale, trade, or transfer as a result of the actions taken by Settling Defendant to comply with the requirements of this Consent Decree.

70. $SO_2$ Allowances allocated to Big Cajun II Units 1 or 2, or Settling Defendant's pro rata ownership share (58%) of any $SO_2$ Allowances allocated to Big Cajun II Unit 3, may be used by Settling Defendant only to meet its own federal and/or state Clean Air Act regulatory requirements for Big Cajun II. Beginning in calendar year 2013, and continuing each calendar year thereafter, Settling Defendant shall Surrender all $SO_2$ Allowances allocated to Settling Defendant for Big Cajun II for that calendar year that Settling Defendant does not need in order to meet its own federal and/or state Clean Air Act regulatory requirements for Big Cajun II.

71. Nothing in this Consent Decree shall prevent Settling Defendant from purchasing or otherwise obtaining $SO_2$ Allowances from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.

72. The requirements in this Consent Decree pertaining to the Defendant's use of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Consent Decree. These provisions shall survive any termination of this Consent Decree.

**E.     Super-Compliance $SO_2$ Allowances**

73. Notwithstanding Paragraphs 69 and 70, nothing in this Consent Decree shall preclude Settling Defendant from selling, banking, trading, or transferring $SO_2$ Allowances allocated to Big Cajun II that become available solely as a result of:

a.      the installation and operation of any $SO_2$ pollution control technology or technique at Big Cajun II that is not otherwise required by this Consent Decree; or

-18-

b.    achievement and maintenance of an Emission Rate below an applicable 30-Day

Rolling Average $SO_2$ Emission Rate,

provided that Settling Defendant is also in compliance for that calendar year with all emission

limitations for $SO_2$ set forth in this Consent Decree. Settling Defendant shall timely report the

generation of such super-compliant $SO_2$ Allowances in accordance with Section XI (Periodic

Reporting) of this Consent Decree.

### F.    Method for Surrender of $SO_2$ Allowances

74. Settling Defendant shall Surrender all $SO_2$ Allowances required to be Surrendered

pursuant to Paragraph 70 by March 1 of the immediately following calendar year.

75. For all $SO_2$ Allowances Surrendered to EPA, the Settling Defendant shall first submit an

$SO_2$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets

Division directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender

Account or to any other EPA account that EPA may direct in writing. Such $SO_2$ Allowance

transfer requests may be made in an electronic manner using the EPA's Clean Air Markets

Division Business System or similar system provided by EPA. As part of submitting these

transfer requests, the Settling Defendant shall irrevocably authorize the transfer of these $SO_2$

Allowances and identify – by name of account and any applicable serial or other identification

numbers or station names – the source and location of the $SO_2$ Allowances being Surrendered.

### VI. PM EMISSION REDUCTIONS AND CONTROLS

### A. Operation and Maintenance of PM Pollution Controls

76. Beginning thirty (30) days after the Date of Entry of this Consent Decree, and continuing

thereafter, Settling Defendant shall Continuously Operate each ESP on Big Cajun II Units 1 and

3, to maximize PM emission reductions at all times when the Unit each serves is in operation. The Settling Defendant shall, at a minimum, to the extent reasonably practicable: (a) fully energize each section of the ESP for each unit, and repair any failed ESP section at the next planned Unit outage (or unplanned outage of sufficient length); (b) operate automatic control systems on each ESP to maximize PM collection efficiency; (c) maintain power levels delivered to the ESPs, consistent with manufacturers' specifications, the operational design of the Unit, and good engineering practices; and (d) inspect for and repair during the next planned Unit outage (or unplanned outage of sufficient length) any openings in ESP casings, ductwork, and expansion joints to minimize air leakage.

### B.   PM Emission Rate and Testing

77. Commencing on the Date of Entry and continuing thereafter, Settling Defendant shall Continuously Operate ESPs at Big Cajun II Units 1 and 3.  Commencing no later than the dates specified in the table below, and continuing thereafter, Settling Defendant shall Continuously Operate each such ESP so as to achieve and maintain a PM Emission Rate no greater than 0.030 lb/mmBTU:

| Big Cajun II Unit | Date to Achieve and Maintain PM Emission Rate |
|---|---|
| ESP at Unit 1 | April 15, 2015 |
| ESP at Unit 3 | April 15, 2015 |

78. Commencing in calendar year 2013, and continuing annually until the installation of PM CEMS at Unit 1 and 3 pursuant to Paragraph 83 herein or the Refueling at Unit 2, Settling Defendant shall conduct a stack test for PM pursuant to Paragraph 79 for Big Cajun II Unit 1,

Unit 2, and Unit 3.  The annual performance test requirement imposed by this Paragraph may be satisfied by stack tests conducted by Settling Defendant as may be required by its permits from the State of Louisiana for any year that such stack tests are required under the permits.

79.  The reference methods and procedures for determining compliance with PM Emission Rates shall be those specified in 40 C.F.R. Part 63, § 10010 or Part 60, Appendix A, Method 5, 5B, or 17, or an alternative method that is promulgated by EPA, requested for use herein by Settling Defendant, and approved for use herein by EPA.  Use of any particular method shall conform to the EPA requirements specified in 40 C.F.R. Part 60, Appendix A and 40 C.F.R. § 60.48a (b) and (e), or any federally-approved method contained in the Louisiana State Implementation Plan.  If compliance is demonstrated with a stack test, Settling Defendant shall calculate the PM Emission Rates from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of each PM stack test shall be submitted to Plaintiffs within forty-five (45) days of completion of each test.

80. Commencing in calendar year 2013, and continuing annually thereafter until the installation of PM CEMS at Unit 1 and 3 pursuant to Paragraph 83 herein or the Refueling at Unit 2, Settling Defendant shall also conduct a PM stack test for condensable PM at each Big Cajun II Unit using the reference methods and procedures set forth at 40 C.F.R. Part 51, Appendix M, Method 202.  Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction. The sampling time for each run shall be at least 120 minutes and the volume of each run shall be at least 1.70 dry standard cubic meters (60 dry standard cubic feet).  Settling Defendant shall calculate the number of pounds of condensable PM emitted per million BTU of heat input

86. Following the installation of each PM CEMS, Settling Defendant shall begin and continue to report to Plaintiffs, pursuant to Section XI (Periodic Reporting), the data recorded by the PM CEMS, as expressed in lb/mmBTU on a 3-hour rolling average basis in electronic format or in a form required by 40 C.F.R. Part 63, including identification of each 3-hour average exceedance of the applicable PM Emission Limitation.

### E.    General PM Provisions

87. Data from the PM CEMS shall be used to determine compliance with the PM Emission Rate established by this Consent Decree.

## VII.  PROHIBITION ON NETTING CREDITS OR OFFSETS

88. Emission reductions that result from actions to be taken by Settling Defendant after the Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a Netting credit or offset under the Clean Air Act's Nonattainment NSR and PSD programs.

89.  The limitations on the generation and use of netting credits or offsets set forth in the previous Paragraph 88 do not apply to emission reductions achieved by Big Cajun II that are greater than those required under this Consent Decree.  For purposes of this Paragraph, emission reductions from Big Cajun II are greater than those required under this Consent Decree if they result from Settling Defendant's emission reductions that are greater than those limits imposed on Big Cajun II under this Consent Decree and under applicable provisions of the Clean Air Act or the Louisiana State Implementation Plan, and that are otherwise federally enforceable, creditable and contemporaneous under the Clean Air Act and applicable regulations.

-24-

90.  Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the State of Louisiana or EPA as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increment, or air quality related values, including visibility, in a Class I area.

## VIII.  ENVIRONMENTAL MITIGATION PROJECTS

91. Settling Defendant shall implement the Environmental Mitigation Projects ("Projects") described in Appendix A to this Decree in compliance with the approved plans and schedules for such Project and other terms of this Consent Decree.  Settling Defendant shall submit plans for the Projects to the Plaintiffs for review and approval pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree in accordance with the schedules set forth in Appendix A.  In implementing the Projects, Settling Defendant shall spend no less than $10,500,000.  Settling Defendant shall not include its own personnel costs in overseeing the implementation of the Projects as Project Dollars.

92. Settling Defendant shall maintain, and present to the Plaintiffs upon request, all documents to substantiate the Project Dollars expended and shall provide these documents to the Plaintiffs within thirty (30) days of a request by the Plaintiffs for the documents.

93. All plans and reports prepared by Settling Defendant pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA shall be publicly available from Settling Defendant without charge.

94. Settling Defendant shall certify, as part of each plan submitted to the Plaintiffs for any Project, that Settling Defendant is not otherwise required by law to perform the Project described

the protocol, Settling Defendant shall thereafter operate each PM CEMS in accordance with the approved protocol.

83. No later than the dates specified below, Settling Defendant shall install, certify, and operate PM CEMS on the stacks for Units 1 and 3 at Big Cajun II.

| Stack | Date to Start Operation PM CEMS |
|-------|--------------------------------|
| Unit 1 | April 15, 2015 |
| Unit 3 | April 15, 2015 |

84. No later than ninety (90) days after Settling Defendant begins operation of the PM CEMS, the Settling Defendant shall demonstrate compliance with the PM CEMS installation and certification plan submitted to and approved by EPA in accordance with Section XII (Review and Approval of Submittals) and shall report such information to EPA and Louisiana DEQ no later thirty (30) days after such tests.

**D.    PM Reporting**

85. Within one-hundred and eighty (180) days after each date established by this Consent Decree for Settling Defendant to achieve and maintain a PM Emission Rate at Big Cajun II, Settling Defendant shall demonstrate compliance with the PM Emission Rate required by this Consent Decree by use of PM CEMS emissions data or a performance test. If a performance test is used to demonstrate compliance, Settling Defendant shall submit the results of the performance test to Plaintiffs within forty-five (45) days of each such performance test at the addresses specified in Section XIII (Notices) of this Consent Decree.

(lb/mmBTU) form the stack test results in accordance with 40 C.F.R. § 60.8(f). The results of the PM stack test conducted pursuant to this Paragraph shall not be used for the purpose of determining compliance with the PM Emission Rates required by this Consent Decree. The results of each PM stack test shall be submitted to Plaintiffs within forty-five (45) days of completion of each test, where completion includes any required QA/QC by the testing company.

### C. Installation and Operation of PM CEMS

81. Settling Defendant shall install, calibrate, operate, and maintain PM CEMS, as specified below. Each PM CEMS shall comprise a continuous particle mass monitor measuring particulate matter concentration, directly or indirectly, on an hourly average basis and a diluent monitor used to convert the concentration to units of lb/mmBTU. Settling Defendant shall maintain, in an electronic database, the hourly average emission values produced by all PM CEMS in lb/mmBTU. Settling Defendant shall use reasonable efforts to keep each PM CEMS running and producing data whenever any Unit served by the PM CEMS is operating.

82. No later than April 15, 2014, Settling Defendant shall submit to EPA pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree: (a) a plan for the installation and certification of each PM CEMS, and (b) a proposed Quality Assurance/Quality Control ("QA/QC") protocol that shall be followed in calibrating such PM CEMS. In developing both the plan for installation and certification of the PM CEMS and the QA/QC protocol, Settling Defendant shall use the criteria set forth in 40 C.F.R. Part 63 or in 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Appendix F, Procedure 3. Following approval by EPA of

in the plan, that Settling Defendant is unaware of any other person who is required by law to perform the Project, and that Settling Defendant will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law.

95. Settling Defendant shall use good faith efforts to secure as much benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

96. If Settling Defendant elects (where such an election is allowed) to undertake a Project by contributing funds to another person or entity that will carry out the Project in lieu of Settling Defendant, but not including Settling Defendant's agents or contractors, that person or instrumentality must, in writing: (a) identify its legal authority for accepting such funding; and (b) identify its legal authority to conduct the Project for which Settling Defendant contributes the funds. Regardless of whether Settling Defendant elected (where such election is allowed) to undertake a Project by itself or to do so by contributing funds to another person or instrumentality that will carry out the Project, Settling Defendant acknowledges that it will receive credit for the expenditure of such funds only if Settling Defendant demonstrates that the funds have been actually spent by either Settling Defendant or by the person or instrumentality receiving them, and that such expenditures met all requirements of this Consent Decree.

97. Beginning six (6) months after entry of this Consent Decree, and continuing until completion of each Project (including any applicable periods of demonstration or testing), Settling Defendant shall provide the Plaintiffs with semi-annual updates concerning the progress of each Project.

98. Within sixty (60) days following the completion of each Project required under this Consent Decree (including any applicable periods of demonstration or testing), Settling Defendant shall submit to the Plaintiffs a report that documents the date that the Project was completed, Settling Defendant's results of implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Settling Defendant in implementing the Project.

## IX.  CIVIL PENALTY

99. Within thirty (30) Days after the Date of Entry of this Consent Decree, Settling Defendant shall pay to the United States and the State of Louisiana a civil penalty in the amount of $3.5 million.

    (a) The United States' portion of the civil penalty shall be paid as follows:  Within thirty (30) Days after the Date of Entry of this Consent Decree, Settling Defendant shall pay a civil penalty to the United States  in the amount of $1.75 million paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2009V00027 and DOJ Case Number 90-5-2-1-08529 and the civil action case name and case number of this action.  The costs of such EFT shall be Settling Defendant's responsibility.  Payment shall be made in accordance with instructions provided to Settling Defendant by the Financial Litigation Unit of the U.S. Attorney's Office for the Middle District of Louisiana.  Any funds received after 2:00 p.m. EDT shall be credited on the next business day.  At the time of payment, Settling Defendant shall provide notice of payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case name and case number, to the

Department of Justice and to EPA in accordance with Section XVIII (Notices) of this Consent Decree.

(b) The LDEQ's portion of the civil penalty shall be paid as follows: Within thirty (30) Days after entry of this Consent Decree, Settling Defendant shall pay to LDEQ a civil penalty in the amount of $1.75 million by certified check made payable to the Louisiana Department of Environmental Quality and sent to Denise Stafford, Fiscal Director, Office of Management and Finance, LDEQ, P.O. Box 4303, Baton Rouge, Louisiana 70821-4303.

100.     Failure to timely pay the civil penalty shall subject Settling Defendant to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Settling Defendant liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

101.     Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## X. RESOLUTION OF CERTAIN CIVIL CLAIMS OF THE PLAINTIFFS

102.     Entry of this Decree shall resolve all civil claims of the United States and LDEQ against Settling Defendant that arose from any modifications commenced at Big Cajun II Units 1 and 2 prior to the Date of Lodging of this Consent Decree, including but not limited to those modifications alleged in the Plaintiffs' Complaints in this civil action and in the NOVs issued to Settling Defendant on February 15, 2005, and December 8, 2006, under any or all of: (a) Parts C

-28-

or D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515; (b) Section 111

of the Clean Air Act, 42 U.S.C. § 7411, and 40 C.F.R.§ 60.14; (c) the federally-approved and

enforceable Louisiana State Implementation Plan; or (d) Sections 502(a) and 504(a) of Title V of

the Clean Air Act, 42 U.S.C §§ 7611(a) and 7611(c), but only to the extent that such Title V

claims are based on Defendant's failure to obtain an operating permit that reflects applicable

requirements imposed under Parts C or D of Subchapter I, or Section 111 of the Clean Air Act.

## XI.  PERIODIC REPORTING

103.      Compliance Report.  After entry of this Decree, Settling Defendant shall submit to

Plaintiffs a periodic report, within sixty (60) days after the end of each half of the calendar year

(January through June and July through December).  The report shall include the following

information:

a.  all information necessary to determine compliance with the requirements of

this Consent Decree;

b.  all information relating to emission allowances and credits that Settling

Defendant claims to have generated in accordance with Sections IV.E and V.E through

compliance beyond the requirements of this Consent Decree;

c.  all information indicating that the installation and commencement of operation

for a pollution control device may be delayed, including the nature and cause of the delay, and

any steps taken by Settling Defendant to mitigate such delay; and

d.  all affirmative defenses asserted pursuant to Paragraphs 116 through 122 during

the period covered by the progress report.

104.     Deviations Report.  In addition to the reports required by the previous Paragraph, if Settling Defendant violates or deviates from any provision of this Consent Decree, Settling Defendant shall submit to Plaintiffs a report on the violation or deviation within fourteen (14) business days after Settling Defendant knew or should have known of the event.  In the report, Settling Defendant shall explain the cause or causes of the violation or deviation and any measures taken or to be taken by Settling Defendant to cure the reported violation or deviation or to prevent such violation or deviations in the future.  If at any time, the provisions of the Decree are included in Title V Permits, consistent with the requirements for such inclusion in the Decree, then the deviation reports required under applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.

105.     Each Settling Defendant report shall be signed by Settling Defendant's Environmental Manager or his or her equivalent, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.  I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## XII.  REVIEW AND APPROVAL OF SUBMITTALS

106.     Settling Defendant shall submit each plan, report, or other submission required by this Decree to EPA whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree.  EPA may approve the submittal or decline to approve it and provide written comments explaining the bases for declining such approval.  Within sixty (60) days of receiving written comments from EPA, Settling Defendant shall either: (a) revise the

submittal consistent with the written comments and provide the revised submittal to EPA; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XV (Dispute Resolution) of this Consent Decree.

107.     Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, Settling Defendant shall implement the approved submittal in accordance with the schedule specified therein or another EPA-approved schedule.

### XIII. STIPULATED PENALTIES

108.     For any failure by Settling Defendant to comply with the terms of this Consent Decree, and subject to the provisions of Sections XIV (Force Majeure) and XV (Dispute Resolution), Settling Defendant shall pay, within thirty (30) days after receipt of written demand to Settling Defendant by the United States or the State of Louisiana, the following stipulated penalties to the United States and the State of Louisiana:

| Consent Decree Violation | Stipulated Penalty |
| --- | --- |
| a. Failure to pay the civil penalty as specified in Section VIII (Civil Penalty) of this Consent Decree | $10,000 per day |
| b. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_x$, where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $2,500 per day per violation |
| c. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_x$, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $5,000 per day per violation |
| d. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $NO_x$, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $10,000 per day per violation |
| e. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $2,500 per day per violation |

| | |
|---|---|
| f. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $5,000 per day per violation |
| g. Failure to comply with any applicable 30-Day Rolling Average Emission Rate for $SO_2$ where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $10,000 per day per violation |
| h. Failure to comply with any applicable PM Emission Rate, where the violation is less than 5% in excess of the lb/mmBTU limit | $2,500 per Operating Day per violation |
| i. Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBTU limit | $5,000 per Operating Day per violation |
| j. Failure to comply with any applicable PM Emission Rate, where the violation is equal to or greater than 10% in excess of the lb/mmBTU limit | $10,000 per Operating Day per violation |
| k. Failure to Repower, Refuel, Retire, or Retrofit any Big Cajun II as required by this Consent Decree | $10,000 per Day for the first 30 Days, 37,500 per Day for each Day thereafter |
| l. Failure to comply with the Plant-Wide Annual Tonnage Limitations for $NO_x$ | $5,000 per ton for the first 100 tons; $10,000 per ton for each additional ton over 100 tons, plus the Surrender, pursuant to the procedures set forth in Section IV.F, of $NO_x$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded |
| m. Failure to comply with the Plant-Wide Annual Tonnage Limitations for $SO_2$ | $5,000 per ton for the first 100 tons; $10,000 per ton for each additional ton over 100 tons, plus the Surrender, pursuant to the procedures set forth in Section V.F, of $SO_2$ Allowances in an amount equal to two times the number of tons by which the limitation was exceeded |
| n. Failure to install, commence operation, or continue operation of the $NO_x$, $SO_2$ or PM pollution control devices on any Unit as required under this Consent Decree | $10,000 per day per violation during the first 30 days, $32,500 per day per violation thereafter |
| o. Failure to conduct a stack test for PM and as required by this Consent Decree | $1,000 per Day per violation |

-32-

| | |
|---|---|
| p.  Failure to install or operate CEMS as required in this Consent Decree | $1,000 per day per violation |
| q.  Failure to apply for any permit required by Section XVI (Permits) | $1,000 per day per violation |
| r.  Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 per day per violation during the first ten days, $1,000 per day per violation thereafter |
| s.  Failure to Surrender $NO_x$ Allowances as required by this Consent Decree | (a) $32,500 per day plus (b) $7,500 per $NO_x$ Allowance not Surrendered, and $5,000 per allowance for each allowance used, sold, or transferred in violation of this Consent Decree |
| t.  Selling, trading, or transferring $NO_x$ Allowances except as permitted by this Consent Decree. | the Surrender of $NO_x$ Allowances in an amount equal to four times the number of $NO_x$ Allowances used, sold, or transferred in violation of this Consent Decree |
| u.  Failure to Surrender $SO_2$ Allowances as required by this Consent Decree | (a) $32,500 per day plus (b) $1,000 per $SO_2$ Allowance not Surrendered, and $5,000 per allowance for each allowance used, sold, or transferred in violation of this Consent Decree |
| v.  Selling, trading, or transferring $SO_2$ Allowances except as permitted by this Consent Decree | the Surrender of $SO_2$ Allowances in an amount equal to four times the number of $SO_2$ Allowances used, sold, or transferred in violation of this Consent Decree |
| w.  Failure to demonstrate the third-party Surrender of an $SO_2$ Allowance in accordance with this Consent Decree | $2,500 per day per violation |
| x.  Failure to optimize the existing ESPs and baghouses as required by this Consent Decree | $1,000 per Day per violation |
| y.  Failure to undertake and complete the Environmental Mitigation Project in compliance with Section VIII (Environmental Mitigation Projects) of this Consent Decree | $1,000 per day per violation during the first 30 days, $5,000 per day per violation thereafter |
| z.  Failure to comply with the sulfur content requirement required by this Consent Decree for Units 1 and 3. | $10,000 per day. |
| aa.  Any other violation of this Consent Decree | $1,000 per day per violation |

109.     Violations of any limit based on a 30-Day Rolling Average constitutes thirty (30) days of violation but where such a violation (for the same pollutant and from the same Unit or source) recurs within periods less than thirty (30) days, Settling Defendant shall not be obligated to pay a daily stipulated penalty, for any day of the recurrence for which a stipulated penalty has already been paid.

110.     All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

111.     Settling Defendant shall pay all stipulated penalties to the United States and LDEQ within thirty (30) days of receipt of written demand to Settling Defendant from the United States or LDEQ, and shall continue to make such payments every thirty (30) days thereafter until the violation(s) no longer continues, unless Settling Defendant elects within twenty (20) days of receipt of written demand to Settling Defendant from the United States or LDEQ to dispute the accrual of stipulated penalties in accordance with the provisions in Section XV (Dispute Resolution) of this Consent Decree.

112.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 110 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

-34-

a.  If the dispute is resolved by agreement, or by a decision of Plaintiffs pursuant to Section XV (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) days of the effective date of the agreement or of the receipt of Plaintiffs' decision;

b.  If the dispute is appealed to the Court and Plaintiffs prevail in whole or in part, Settling Defendant shall, within sixty (60) days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph c, below;

c.  If the Court's decision is appealed by any Party, Settling Defendant shall, within fifteen (15) days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined to be owing, together with interest accrued on such stipulated penalties determined to be owing by the appellate court.

Notwithstanding any other provision of this Consent Decree, either the United States or LDEQ, or both, may in the unreviewable exercise of their respective discretion, reduce or waive stipulated penalties otherwise due to that Party under this Consent Decree, and the accrued stipulated penalties agreed by the Plaintiffs and Settling Defendant, or determined by the Plaintiffs through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 108.  The United States and LDEQ shall divide equally any stipulated penalties paid, agreed to, or awarded under this Consent Decree.

113.     All monetary stipulated penalties shall be paid in the manner set forth in Section IX (Civil Penalty) of this Consent Decree.  All allowance Surrender penalties shall comply with the allowance Surrender procedures set forth in this Consent Decree.

114.     Should Settling Defendant fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States and LDEQ shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

115.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States and LDEQ by reason of Settling Defendant's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree provides for payment of a stipulated penalty, Settling Defendant shall be allowed a credit for stipulated penalties paid against any statutory penalties also imposed for such violation.

116.     Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Malfunctions:  If any of the Units at Big Cajun II exceed an applicable 30-Day Rolling Average Emission Rate for $NO_x$ or $SO_2$ set forth in this Consent Decree due to Malfunction, Settling Defendant, bearing the burden of proof, has an affirmative defense to, and shall not be subject to, stipulated penalties under this Consent Decree, if Settling Defendant has complied with the reporting requirements of Paragraphs 121 and 122 and has demonstrated all of the following:

        a.     the excess emissions were caused by a sudden, unavoidable breakdown of technology, beyond Settling Defendant's control;

-36-

b.     the excess emissions (1) did not stem from any activity or event that could have been foreseen and avoided, or planned for, and (2) could not have been avoided by better operation and maintenance practices;

c.     to the maximum extent practicable, the air pollution control equipment and processes were maintained and operated in a manner consistent with good practice for minimizing emissions;

d.     repairs were made in an expeditious fashion when Settling Defendant knew or should have known that an applicable 30-Day Rolling Average Emission Rate was being or would be exceeded.  Off-shift labor and overtime must have been utilized, to the extent practicable, to ensure that such repairs were made as expeditiously as practicable;

e.     the amount and duration of the excess emissions (including any bypass) were minimized to the maximum extent practicable during periods of such emissions;

f.     all reasonably possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

g.     all emission monitoring systems were kept in operation if at all possible;

h.     Settling Defendant's actions in response to the excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence;

i.     the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance; and

-37-

j.      Settling Defendant properly and promptly notified Plaintiffs as required by this Consent Decree.

117.    To assert an affirmative defense for Malfunction under Paragraph 116, Settling Defendant shall submit all data demonstrating the actual emissions for the Day the Malfunction occurs and the 29-Day period following the Day the Malfunction occurs.  Settling Defendant may, if it elects, submit emissions data for the same 30-Day period but that excludes the excess emissions.

118.    <u>Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring During Startup and Shutdown</u>:  If any of the Units at Big Cajun II exceed an applicable 30-Day Rolling Average Emission Rate for $NO_x$ or $SO_2$ set forth in this Consent Decree due to startup or shutdown, Settling Defendant, bearing the burden of proof, has an affirmative defense to, and shall not be subject to, stipulated penalties under this Consent Decree, if Settling Defendant has complied with the reporting requirements of Paragraphs 121 and 122 and has demonstrated all of the following:

a.      the periods of excess emissions that occurred during startup and shutdown were short and infrequent and could not have been prevented through careful planning and design consistent with good engineering, operation, and maintenance practices and manufacturers' specifications and recommendations;

b.      the excess emissions were not part of a recurring pattern indicative of inadequate design, operation, or maintenance;

-38-

      c.     if the excess emissions were caused by a bypass (an intentional diversion of control equipment), then the bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

      d.     at all time, the facility was operated in a manner consistent with good practice for minimizing emissions;

      e.     the frequency and duration of operation in startup or shutdown mode was minimized to the maximum extent practicable and consistent with good engineering, operation, and maintenance practices and manufacturers' specifications and recommendations;

      f.     all reasonably possible steps were taken to minimize the impact of the excess emissions on ambient air quality;

      g.     All emissions monitoring systems were kept in operation if at all possible;

      h.     Settling Defendant's actions during the period of excess emissions were documented by properly signed, contemporaneous operating logs, or other relevant evidence; and

      i.     Settling Defendant properly and promptly notified EPA as required by this Consent Decree

119.     To assert an affirmative defense for startup or shutdown under Paragraph 118, Settling Defendant shall submit all data demonstrating the actual emissions for the Day the excess emissions from startup or shutdown occurs and the 29-Day period following the Day the excess emissions from startup or shutdown occurs. Settling Defendant may, if it elects, submit emissions data for the same 30-Day period but that excludes the excess emissions.

120.     If excess emissions occur due to a Malfunction during routine startup and shutdown, then those instances shall be treated as other Malfunctions subject to Paragraph 116.

121.     For an affirmative defense under Paragraphs 116 and 118, Settling Defendant, bearing the burden of proof, shall demonstrate, through submission of the data and information under the reporting provisions of this Section, that all reasonable and practicable measures within Settling Defendant's control were implemented to prevent the occurrence of the excess emissions.

122.     Settling Defendant shall provide notice to EPA and LDEQ in writing of Settling Defendant's intent to assert an affirmative defense for Malfunction, startup, or shutdown under Paragraphs 116 and 122, in Settling Defendant's semi-annual progress reports as required by Paragraph 103.  This notice shall be submitted to EPA pursuant to the provisions of Section XIII (Notices).  The notice shall contain:

    a.     The identity of each stack or other emission point where the excess emissions occurred;

    b.     The magnitude of the excess emissions expressed in lb/mmBTU and the operating data and calculations used in determining the magnitude of the excess emissions;

    c.     The time and duration of the excess emissions;

    d.     The identity of the equipment from which the excess emissions emanated;

    e.     The nature and cause of the excess emissions;

f.      The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunction;

g.      The steps that were or are being taken to limit the excess emissions; and

h.      If applicable, a list of the steps taken to comply with permit conditions governing Unit operation during periods of startup, shutdown, and/or Malfunction.

123.    A Malfunction, startup, or shutdown shall not constitute a Force Majeure Event unless the Malfunction, startup, or shutdown meets the definition of a Force Majeure Event, as provided in Section XIV (Force Majeure).

124.    The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

## XIV. FORCE MAJEURE

125.    For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Settling Defendant, its contractors, or any entity controlled by Settling Defendant that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Settling Defendant's best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or violation and any adverse environmental effect is minimized to the greatest extent possible.

-41-

126.     <u>Notice of Force Majeure Events</u>.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Settling Defendant intends to assert a claim of Force Majeure, Settling Defendant shall notify the Plaintiffs in writing as soon as practicable, but in no event later than fourteen (14) business days following the date Settling Defendant first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation. In this notice, Settling Defendant shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Settling Defendant to prevent or minimize the delay or violation, the schedule by which Settling Defendant proposes to implement those measures, and Settling Defendant's rationale for attributing a delay or violation to a Force Majeure Event.  Settling Defendant shall adopt all reasonable measures to avoid or minimize such delays or violations.  Settling Defendant shall be deemed to know of any circumstance which Settling Defendant, its contractors, or any entity controlled by Settling Defendant knew or should have known.

127.     <u>Failure to Give Notice</u>.  If Settling Defendant fails to comply with the notice requirements of this Section, Plaintiffs may void Settling Defendant's claim for Force Majeure as to the specific event for which Settling Defendant has failed to comply with such notice requirement.

128.     <u>Plaintiffs' Response</u>.  Plaintiffs shall notify Settling Defendant in writing regarding Settling Defendant's claim of Force Majeure as soon as reasonably practicable.  If Plaintiffs agree that a delay in performance has been or will be caused by a Force Majeure Event, Plaintiffs and Settling Defendant shall stipulate to an extension of deadline(s) for performance of

the affected compliance requirement(s) by a period equal to the delay actually caused by the event. In such circumstances, an appropriate modification shall be made pursuant to Section XXII (Modification) of this Consent Decree.

129.     Disagreement.  If Plaintiffs do not accept Settling Defendant's claim of Force Majeure, or if Plaintiffs and Settling Defendant cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XV (Dispute Resolution) of this Consent Decree.

130.     Burden of Proof.  In any dispute regarding Force Majeure, Settling Defendant shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. Settling Defendant shall also bear the burden of proving that Settling Defendant gave the notice required by this Section and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.  An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

131.     Events Excluded.  Unanticipated or increased costs or expenses associated with the performance of Settling Defendant's obligations under this Consent Decree shall not constitute a Force Majeure Event.

132.     Potential Force Majeure Events.  The Parties agree that, depending upon the circumstances related to an event and Settling Defendant's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; acts of God; acts of war or terrorism; and orders by a government

official, government agency, other regulatory authority, or a regional transmission organization, acting under and authorized by applicable law, that directs Settling Defendant to supply electricity in response to a state-wide or regional emergency. Depending upon the circumstances and Settling Defendant's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Settling Defendant and Settling Defendant has taken all steps available to it to obtain the necessary permit, including, but not limited to: submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

133.    As part of the resolution of any matter submitted to this Court under Section XV (Dispute Resolution) of this Consent Decree regarding a claim of Force Majeure, the Plaintiffs and Settling Defendant by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the United States and the States or approved by the Court. Settling Defendant shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule (provided that Settling Defendant shall not be precluded from making a further claim of Force Majeure with regard to meeting any such extended or modified schedule).

## XV. DISPUTE RESOLUTION

134.     The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

135.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such notice unless otherwise agreed to by the parties in writing.

136.     Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties.  Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the disputing Parties' representatives unless they agree in writing to shorten or extend this period.  During the informal negotiations period, the disputing Parties may also submit their dispute to a mutually agreed upon alternative dispute resolution (ADR) forum if the Parties agree that the ADR activities can be completed within the 30-day informal negotiations period (or such longer period as the Parties may agree to in writing).

137.     If the disputing Parties are unable to reach agreement during the informal negotiation period, the Plaintiffs shall provide Settling Defendant with a written summary of their position regarding the dispute.  The written position provided by Plaintiff shall be considered binding unless, within forty-five (45) calendar days thereafter, Settling Defendant

seeks judicial resolution of the dispute by filing a petition with this Court.  Plaintiffs may respond to the petition within forty-five (45) calendar days of filing.

138.     The time periods set out in this Section may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the party's basis for seeking such a scheduling modification.

139.     This Court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

140.     As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution.  Settling Defendant shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Settling Defendant not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

141.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their initial filings with the Court, the disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XVI. PERMITS

142.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Settling Defendant to secure a permit to authorize construction or operation of any device contemplated herein, including all preconstruction, construction, and operating permits required under state law, Settling Defendant shall make such application in a timely manner.  Settling Defendant shall provide Notice to Plaintiffs under Section XVIII (Notices), for each unit that the Settling Defendant submits an application for any permit described in this Paragraph.

143.     Notwithstanding the previous Paragraph, nothing in this Consent Decree shall be construed to require Settling Defendant to apply for or obtain a PSD or Nonattainment NSR permit for physical changes in, or changes in the method of operation of Big Cajun II that would give rise to claims resolved by Section X (Resolution of Certain Civil Claims of the Plaintiffs) of this Consent Decree.

144.     When permits are required as described in this Section, Settling Defendant shall complete and submit applications for such permits to the appropriate authorities to allow time for all legally required processing and review of the permit request, including requests for additional information by the permitting authorities.  Any failure by Settling Defendant to submit a timely permit application for Big Cajun II shall bar any use by Settling Defendant of Section XIV (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

145.     Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act.  The Title V permits shall not be enforceable under this Consent Decree, although any term or limit

-47-

established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of a Title V permit, subject to the terms of Section XXVI (Conditional Termination of Enforcement Under Decree) of this Consent Decree.

146.     Within one hundred eighty (180) days after entry of this Consent Decree, Settling Defendant shall amend any applicable Title V permit application, or apply for amendments of its Title V permit, to include a schedule for all unit-specific and plant-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, required emission rates, the Plant-Wide Annual Tonnage Limitations, the requirement pertaining to the use and Surrender of $SO_2$ and $NO_x$ Allowances, and the requirements pertaining to Refueling Big Cajun II Unit 2 and Repowering, Refueling, Retiring or Retrofitting Big Cajun II Unit 1.

147.     Within one (1) year from the written election for Big Cajun II Unit 1 to be made pursuant to Paragraph 63 of this Consent Decree, Settling Defendant shall either apply to permanently include the requirements and limitations enumerated in this Consent Decree into a federally enforceable permit or request a site-specific amendment to the Louisiana SIP, such that the requirements and limitations become and remain "applicable requirements" as that term is defined in 40 C.F.R. § 70.2.  The permit shall require compliance with the following: (a) any applicable Emission Rate, (b) the Plant-Wide Annual Tonnage Limitations for $SO_2$ and $NO_x$, (c) the Allowance Surrender requirements set forth in this Consent Decree, and (d) the requirements pertaining to Refueling Big Cajun II Unit 2 and Repowering, Refueling, Retiring or Retrofitting Big Cajun II Unit 1.

-48-

148.     Settling Defendant shall provide the Plaintiffs with a copy of each application to amend its Title V permit for Big Cajun II, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

149.     Prior to conditional termination of enforcement through this Consent Decree, Settling Defendant shall obtain enforceable provisions in its Title V permit for Big Cajun II that incorporates all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree including, but not limited to, (a) Emission Rates, (b) Plant-Wide Annual Tonnage Limitations, (c) the requirements pertaining to the Surrender of $SO_2$ and $NO_x$ Allowances, and (d) the requirements pertaining to Refueling Big Cajun II Unit 2 and Repowering, Refueling, Retiring or Retrofitting Big Cajun II Unit 1.

150.     If Settling Defendant sells or transfers to an entity unrelated to Settling Defendant ("Third Party Purchaser") part or all of its Ownership Interest in Big Cajun II, Settling Defendant shall comply with the requirements of Section XIX (Sales or Transfers of Ownership Interests) with regard to that Unit prior to any such sale or transfer unless, following any such sale or transfer, Settling Defendant remains the holder of the Title V permit for such facility.

## XVII. INFORMATION COLLECTION AND RETENTION

151.     Any authorized representative of the United States or LDEQ, including their attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of Big Cajun II at any reasonable time for the purpose of:

a.     monitoring the progress of activities required under this Consent Decree;

b.     verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

-49-

c.      obtaining samples and, upon request, splits of any samples taken by Settling

Defendant or its representatives, contractors, or consultants; and

d.      assessing Settling Defendant's compliance with this Consent Decree.

151A.      Settling Defendant shall retain, and instruct its contractors and agents to preserve,

all non-identical copies of all records and documents (including records and documents in

electronic form) now in its or its contractors' or agents' possession or control, and that directly

relate to Settling Defendant's performance of its obligations under this Consent Decree until

December 31, 2021.  This record retention requirement shall apply regardless of any corporate

document retention policy to the contrary.

152.      All information and documents submitted by Settling Defendant pursuant to this

Consent Decree shall be subject to any requests under applicable law providing public disclosure

of documents unless (a) the information and documents are subject to legal privileges or

protection or (b) Settling Defendant claims and substantiates in accordance with 40 C.F.R. Part 2

that the information and documents contain confidential business information.

153.      Nothing in this Consent Decree shall limit the authority of the EPA or LDEQ to

conduct tests and inspections at Settling Defendant's facilities under Section 114 of the Act, 42

U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XVIII. NOTICES

154.     Unless otherwise provided herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

As to the United States of America:
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
DJ# 90-5-2-1-06837

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

and

Associate Director of the Air Enforcement Branch
U.S. EPA- Region 6   (6EN-A)
1445 Ross Avenue
Dallas, TX 75202

As to LDEQ
Cheryl Nolan
Administrator, Enforcement Division
Assistant Secretary
Louisiana Department of Environmental Quality
P. O. Box 4312
Baton Rouge, Louisiana 70821-4312

And

Dwana King
Office of the Secretary, Legal Division
Louisiana Department of Environmental Quality
P.O. Box 4302

-51-

Baton Rouge, Louisiana, 70821-4302

<u>As to Louisiana Generating</u>:

Attn:  General Counsel
Louisiana Generating LLC
112 Telly Street
New Roads, LA 70760

And

William Bumpers
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

155.     All notifications, communications or submissions made pursuant to this Section shall be sent either by:  (a) overnight mail or overnight delivery service, or (b) certified or registered mail, return receipt requested.  All notifications, communications and transmissions (a) sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service.

156.     Any Party may change either the notice recipient or the address for providing notices to it by serving all other Parties with a notice setting forth such new notice recipient or address.

## XIX. SALES OR TRANSFERS OF OWNERSHIP INTERESTS

157.     If Settling Defendant proposes to sell or transfer an Ownership Interest to another entity (a "Third Party Purchaser"), Settling Defendant shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the Plaintiffs pursuant to Section XIII (Notices) of this Consent Decree at least sixty (60) days before such proposed sale or transfer.

158.     No sale or transfer of an Ownership Interest shall take place before the Third Party Purchaser and Plaintiffs, have executed, and the Court has approved, a modification pursuant to Section XXII (Modification) of this Consent Decree making the Third Party Purchaser a party to this Consent Decree and jointly and severally liable with Settling Defendant for all the requirements of this Decree that may be applicable to the transferred or purchased Ownership Interests.

159.     This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between Settling Defendant and any Third Party Purchaser so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation – as between Settling Defendant and any Third Party Purchaser of Ownership Interests – of the burdens of compliance with this Decree, provided that both Settling Defendant and such Third Party Purchaser shall remain jointly and severally liable to Plaintiffs for the obligations of the Decree applicable to the transferred or purchased Ownership Interests.

160.     If Plaintiffs agree, Plaintiffs, Settling Defendant, and the Third Party Purchaser that has become a party to this Consent Decree pursuant to Paragraph 158, may execute a modification that relieves Settling Defendant of its liability under this Consent Decree for, and

makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Ownership Interests. Notwithstanding the foregoing, however, Settling Defendant may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections VIII (Environmental Mitigation Projects) and IX (Civil Penalty). Settling Defendant may propose and the Plaintiffs may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

## XX. EFFECTIVE DATE

161.     The effective date of this Consent Decree shall be the Date of Entry.

## XXI. RETENTION OF JURISDICTION

162.     The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes. During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXII. MODIFICATION

163.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Plaintiffs and Settling Defendant.  Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

## XXIII. GENERAL PROVISIONS

164.     When this Consent Decree specifies that Settling Defendant shall achieve and maintain a 30-Day Rolling Average Emission Rate, the Parties expressly recognize that compliance with such 30-Day Rolling Average Emission Rate shall commence immediately upon the date specified, and that compliance as of such specified date (e.g., December 30) shall be determined based on data from the 29 prior Unit Operating Days (e.g., December 1-29).

165.     This Consent Decree is not a permit.  Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.  The emission rates set forth herein do not relieve the Settling Defendant from any obligation to comply with other state and federal requirements under the Clean Air Act, including the Settling Defendant's obligation to satisfy any state modeling requirements set forth in the Louisiana State Implementation Plan.

166.     This Consent Decree does not apply to any claim(s) of alleged criminal liability.

167.     In any subsequent administrative or judicial action initiated by the Plaintiffs for injunctive relief or civil penalties relating to the facilities covered by this Consent Decree, the Settling Defendant shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the Plaintiffs in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however,

that nothing in this Paragraph is intended to affect the validity of Section X (Resolution of Certain Civil Claims of the United States).

168.     Nothing in this Consent Decree shall relieve Settling Defendant of its obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, the  Clean Water Act and the National Pollutant Discharge Elimination System (NPDES) implementing regulations, National Ambient Air Quality Standards, the National Emission Standards for Hazardous Air Pollutants From Coal and Oil-Fired Electric Utility Steam Generating Units (Utility MACT), and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-commercial-Institutional, and Small Industrial Commercial-Institutional Steam Generating Units (Utility NSPS).  Nothing in this Consent Decree shall be construed to provide any relief from the emission limits or deadlines for the installation of pollution controls or the implementation of other pollution control-related measures specified in these regulations.

169.     Subject to the provisions in Section X (Resolution of Certain Civil Claims), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

170.     Nothing in this Consent Decree is intended to, or shall, alter or waive any applicable law (including but not limited to any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8314 (Feb. 24, 1997)) concerning the use of data for any purpose under the Act.

171.     Each limit and/or other requirement established by or under this Decree is a separate, independent requirement.

172.     Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed.  For example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101.  Settling Defendant shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits.  For example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100.  Settling Defendant shall report data to the number of significant digits in which the standard or limit is expressed.

173.     This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third parties.

174.     This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

175.     Each Party to this action shall bear its own costs and attorneys' fees.

## XXIV. SIGNATORIES AND SERVICE

176.     Each undersigned representative of Settling Defendant and LDEQ, and the

Assistant Attorney General for the Environment and Natural Resources Division of the United

States Department of Justice, certifies that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind to this document the Party he

or she represents.

177.     This Consent Decree may be signed in counterparts, and such counterpart

signature pages shall be given full force and effect.

## XXV. PUBLIC COMMENT

178.     The Parties agree and acknowledge that final approval by the United States and

entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for

notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public

comment, and the right of the United States to withdraw or withhold consent if the comments

disclose facts or considerations which indicate that the Consent Decree is inappropriate,

improper or inadequate.  The Defendant shall not oppose entry of this Consent Decree by this

Court or challenge any provision of this Consent Decree unless the United States has notified the

Defendant, in writing, that the United States no longer supports entry of the Consent Decree.

Further, the parties agree and acknowledge that final approval by the Louisiana Department of

Environmental Quality, and entry of this Consent Decree is subject to the requirements of La.

R.S. 30:2050.7, which provides for public notice of this Consent Decree in newspapers of

general circulation and the official journals of parishes in which the Louisiana Generating

facilities are located, an opportunity for public comment, consideration of any comments, and

concurrence by the State Attorney General.  LDEQ reserves the right to withdraw or withhold

consent if the comments regarding this Consent Decree disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper or inadequate.

### XXVI. CONDITIONAL TERMINATION UNDER DECREE

179.    <u>Termination as to Completed Tasks.</u>  As soon as Settling Defendant completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, Settling Defendant may, by motion to this Court, seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

180.    <u>Conditional Termination of Enforcement Through the Consent Decree.</u>  After Settling Defendant:

a.    has successfully completed construction, and has maintained operation, of all pollution controls as required by this Consent Decree for at least one (1) year, and has Refueled Big Cajun II Unit 2 and Retrofit, Retired, Repowered or Refueled Big Cajun II Unit 1; and

b.    has obtained all the final permits and/or site-specific SIP amendments (1) as required by Section XVI (Permits) of this Consent Decree, and (2) that include as federally enforceable permit terms, all Unit-specific, plant-specific, and system-specific performance, operational, maintenance, and control technology requirements established by this Consent Decree; then Settling Defendant may so certify these facts to the Plaintiffs and this Court. If the Plaintiffs do not object in writing with specific reasons within forty-five (45) days of receipt of Settling Defendant's certification, then, for any Consent Decree violations that occur after the filing of notice, the Plaintiffs shall pursue enforcement of the requirements through the applicable permits and/or other enforcement authorities and not through this Consent Decree.

181.    <u>Resort to Enforcement under this Consent Decree.</u>  Notwithstanding Paragraph 180, if enforcement of a provision in this Consent Decree cannot be pursued by the United States

-59-

under the applicable permit(s) issued pursuant to the Clean Air Act or its implementing regulations ("CAA Permit"), or if a Consent Decree requirement was intended to be part of a CAA Permit and did not become or remain part of such permit, then such requirement may be enforced under the terms of this Consent Decree at any time.

## XXVII. FINAL JUDGMENT

182.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment among the Plaintiffs and Settling Defendant.

SO ORDERED, THIS 6th DAY OF MARCH, 2013.

_____
HONORABLE JAMES J. BRADY
UNITED STATES DISTRICT COURT JUDGE

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources
 Division
United States Department of Justice

W. Benjamin Fisherow
Chief
Richard M. Gladstein
Senior Counsel
James A. Lofton
Justin A. Savage
Elias L. Quinn
Anna Cross
Andrew Hanson
Jason A. Dunn
Attorneys
Environmental Enforcement Section
Environment and Natural Resources
 Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1111

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree

FOR THE UNITED STATES DEPARTMENT OF JUSTICE

Respectfully submitted,

DONALD J. CAZAYOUX, JR.
UNITED STATES ATTORNEY

John J. Gaupp, LBN 14976
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and
    Compliance Assurance
United States Environmental
    Protection Agency

SUSAN SHINKMAN
Director, Office of Civil Enforcement
United States Environmental
    Protection Agency

PHILLIP A. BROOKS
Director, Air Enforcement Division
United States Environmental
    Protection Agency

SEEMA KAKADE
MELANIE SHEPHERDSON
Attorney-Advisors
United States Environmental
    Protection Agency
1200 Pennsylvania Ave, N.W. (2242A)
Washington, DC 20460

-63-

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Respectfully submitted,

JOHN BLEVINS
Director, Compliance Assurance and
    Enforcement Division
United States Environmental
    Protection Agency, Region 6

ANDREA CARRILLO
Assistant Regional Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree, subject to the public notice and comment requirements.

FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY

Respectfully submitted,

Cheryl S. Nolan
Assistant Secretary
Office of Environmental Compliance
Louisiana Department of Environmental Quality
P.O. Box 4312
Baton Rouge, Louisiana 70821-4312

Dwana C. King (LA Bar Roll# 20590)
Attorney
Office of the Secretary, Legal Division
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Telephone No. (225) 219-3987

Signature Page for *United States of America and the State of Louisiana v. Louisiana Generating LLC* Consent Decree


FOR LOUISIANA GENERATING LLC

Respectfully submitted,

Jennifer J. Vosburg
President
Louisiana Generating LLC
112 Telly Street
New Roads, LA 70760

# APPENDIX A
# ENVIRONMENTAL MITIGATION PROJECTS

In compliance with and in addition to the requirements in Section VIII (Environmental Mitigation Projects) of the Consent Decree, LaGen shall comply with the requirements of this Appendix to ensure that the benefits of the $10,500,000 in total Project Dollars are achieved. LaGen shall spend no less than $9,000,000 on United States Environmental Mitigation Projects and no less than $1,500,000 on State of Louisiana Environmental Mitigation Projects consistent with the requirements of this Appendix. Nothing in the Consent Decree or in this Appendix shall require LaGen to spend any more than a total of $10,500,000 on Environmental Mitigation Projects.

## UNITED STATES ENVIRONMENTAL MITIGATION PROJECTS

**I.    Land and Ecological Restoration  ($1 million)**

A.    National Park Service Mitigation:  Within 45 Days from the Date of Entry of this Consent Decree, LaGen shall pay $500,000 to the National Park Service in accordance with 16 U.S.C. § 19jj for the restoration of land, watersheds, vegetation, and forests using techniques designed to improve ecosystem health and mitigate harmful effects from air pollution. Projects will focus on the Jean Lafitte National Historical Park and Preserve (southeast of Baton Rouge), the Vicksburg National Military Park, and/or the Natchez Trace Parkway.

B.    Payment of the amount specified in the preceding Paragraph shall be made to the Natural Resources Damage and Assessment Fund managed by the United States Department of the Interior. Instructions for transferring funds will be provided to LaGen by the National Park Service. Notwithstanding Section I.A of this Appendix, payment of funds is not due until ten (10) days after receipt of payment instructions.  Upon payment of the required funds into the Natural Resource Damage and Assessment Fund, LaGen shall have no further responsibilities regarding the implementation of any project selected by the National Park Service in connection with this provision.

C.    United States Forest Service Mitigation:  Within 45 Days from the Date of Entry of this Consent Decree, LaGen shall pay $500,000 to the United States Forest Service in accordance with 16 U.S.C. § 579c, for the improvement, protection, or rehabilitation of lands under the administration of the United States Forest Service. Projects will focus on the Kisatchie National Forest (northwest of Baton Rouge) or other United States Forest Service lands in the surrounding region.

D.    Payment of the amount specified in the preceding Paragraph shall be made to the Forest Service pursuant to payment instructions provided to LaGen.  Notwithstanding Section I.C of this Appendix, payment of funds by LaGen is not due until ten (10) days after receipt of payment instructions.  Upon payment of the required funds, LaGen shall have no further responsibilities regarding the implementation of any project selected by the Forest Service in connection with this provision.

## II.    Overall Schedule and Budget for Remaining United States Environmental Mitigation Projects

A.    Within 120 Days of the Date of Entry, as further described below, LaGen shall submit proposed project(s) plan(s) to EPA for review and approval pursuant to Section XII of the Consent Decree (Review and Approval of Submittals) for completing the remaining $8,000,000 in United States Environmental Mitigation Projects over a period of not more than 5 years from the date of plan approval.  The Project Dollars shall be spent on projects chosen from Sections III, IV, and V of this Appendix.  LaGen also may elect to spend Project Dollars on projects identified in Section VI of this Appendix.  EPA reserves the right to disapprove any of the Project plans should the Agency determine based on an analysis of the plans submitted by LaGen and all the potential environmental impacts that the Project is not environmentally beneficial.  If LaGen opts not to perform one of the Projects, it will not have any obligations for such Project pursuant to this Consent Decree, including performance, reporting, or closure requirements for that Project, provided that LaGen is otherwise in compliance with the Environmental Mitigation Project requirements of this Consent Decree.  If LaGen subsequently opts not to perform a Project for which it has submitted a plan that has been approved by EPA then it will indicate withdrawal from the Project in its next semi-annual Environmental Mitigation Plan report pursuant to Paragraph 97 of the Consent Decree.

B.    LaGen may, at its election, consolidate the plans required by this Appendix into a single plan.

C.    The Parties agree that LaGen is entitled to spread its payments for Environmental Mitigation Projects over the five-year period commencing upon the date of plan approval. LaGen is not, however, precluded from accelerating payments to better effectuate a proposed mitigation plan, provided that LaGen shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures.

D.    All proposed Project plans shall include the following:

   1.    A plan for implementing the Project;

   2.    A summary-level budget for the Project;

   3.    A time-line for implementation of the Project; and

   4.    A description of the anticipated environmental benefits of the Project including an estimate of emission reductions (*e.g.*, $SO_2$, $NO_x$, PM, $CO_2$) expected to be realized.

E.    Upon approval of the plan(s) required by this Appendix by EPA, LaGen shall complete the approved Projects according to the approved plan(s).  Nothing in this Consent Decree shall be interpreted to prohibit LaGen from completing the Projects ahead of schedule.

F.    Commencing with the first progress report due pursuant to Section XI (Periodic Reporting) of the Consent Decree, and continuing biannually thereafter until completion of the

Project(s), LaGen will include in the progress report information describing the progress of the Project and the Project Dollars expended on the Project.

G.    In accordance with the requirements of Paragraph 98 of the Consent Decree, within 60 Days following the completion of each Project, LaGen shall submit to EPA for approval of Project closure, a Project completion report that documents:

1.    The date the Project was completed;

2.    The results and documentation of implementation of the Project, including the estimated emission reductions or other environmental benefits achieved;

3.    The Project Dollars incurred by LaGen in implementing the Project; and

4.    Certification by a Responsible Official in accordance with Paragraph 105 of the Consent Decree that the Project has been completed in full satisfaction of the requirements of the Consent Decree and this Appendix.

H.    If EPA concludes based on the Project completion report or subsequent information provided by LaGen that the Project has been performed and completed in accordance with the Consent Decree, then EPA will approve completion of the Project for purposes of the Consent Decree.

## III.    Nitrogen Impact Mitigation in False River ($1 million)

A.    Within 120 days of the Date of Entry, LaGen shall submit a plan to EPA for review and approval for the mitigation of adverse impacts on the False River associated with nitrogen ("False River Mitigation Project").  LaGen shall spend a total of $1 million in Project Dollars on the False River Mitigation Project.

B.    LaGen's proposed plan shall:

1.    Describe proposed Project(s) that reduce nitrogen loading in the False River or otherwise mitigate the adverse effects of nitrogen in the False River.  Projects that may be approved include, by way of illustration, creation of forested stream buffers on agricultural land or other land cover to establish a "buffer zone" to filter runoff before it enters the waterway or installation of fencing to keep livestock out of the adjoining waterway.

2.    Describe generally the expected environmental benefit of the proposed False River Mitigation Project, including co-benefits that would result from reducing nitrogen runoff such as reducing phosphorous runoff and preventing algal blooms.  The key criteria for selection of components of the Project are the magnitude of the expected ecological/environmental benefit(s) in relation to the cost and the relative permanence of the

expected benefit(s). Expected loadings benefits should be quantified to the extent practicable.

3.    Describe the expected cost of each element of the False River Mitigation Project, including the fair market value of any interests in land to be acquired.

4.    Identify any person or entity other than LaGen that will be involved in any aspect of the False River Mitigation Project. LaGen shall describe the third-party's role in the action and the basis for asserting that such entity is able and suited to perform the intended role. For purposes of this Section of the Appendix, third-parties shall only include non-profits; federal, state, and local agencies; or universities. Any proposed third-party must be legally authorized to perform the proposed action or to receive Project Dollars.

5.    Include a schedule for completing and funding each portion of the Project.

C.    Performance: Upon approval of the plan for False River Mitigation by EPA, LaGen shall complete the Project according to the approved plan and schedule.

## IV.    Electric Vehicle Infrastructure Enhancement (Up to $4 million)

A.    Within 120 days from the Date of Entry of this Consent Decree, LaGen shall submit to EPA for review and approval pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree a plan for the reduction of pollutants through the enhanced use of electric vehicles in South Louisiana. In its plan, LaGen shall propose enhancements to the electric vehicle charging infrastructure in South Louisiana in an amount not to exceed $4 million in Project Dollars to be expended within five years of the date of plan approval.

B.    LaGen shall undertake enhancements to the electric vehicle charging infrastructure by funding creation of one or more charging stations for electric vehicles in the South Louisiana area. Battery powered and some hybrid vehicles need plug-in infrastructure to recharge the batteries. Establishment of electric vehicle charging stations in South Louisiana could expand the useful driving range of electric vehicles in the local metropolitan areas as well as encourage South Louisiana drivers to purchase electric vehicles for local and commuting use. Locations for such charging stations would be targeted for areas where vehicles could be left for several hours to fully charge the electric vehicle's battery system.

C.    In undertaking this Project, LaGen may partner with third party organizations to handle funding and selection of locations in South Louisiana. Locations would be sought to maximize the number of vehicles that could utilize the chargers while striving to expand into South Louisiana the network of electric vehicle charging stations currently in the region. Potential sites could consist of locations that provide public access, including parking lots at mass transit facilities, large industrial facilities or similar employers, or other locations where charging will encourage electric vehicle usage.

D.    Emission reductions:  Overall emissions reductions would depend upon the number of vehicles utilizing the facilities and would be based upon the type of vehicle the electric vehicle replaces in the general geographic area, the emissions characteristics and the annual vehicle miles traveled ("VMT").  For the term of this project LaGen would commit to effectively supply the vehicle charging station with zero emission renewable energy sources through the use of renewable energy credits ("RECs").  Therefore the usage would be considered emission free.  LaGen will report the expected and achieved environmental benefits.

E.    Upon EPA's approval of the plan, LaGen shall complete the Projects described in this Section according to the approved plan and schedule.

## V.    Solar Photovoltaic (PV) Installation Projects (Up to $6.5 million)

A.    Within 120 days from the Date of Entry of this Consent Decree, LaGen shall submit to EPA for review and approval pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree a plan for the reduction of pollutants through the installation of photovoltaic panels and associated equipment consistent with the specifications listed below. In its plan, LaGen shall propose Solar Photovoltaic ("PV") Installations in an amount not to exceed $6.5 million in Project Dollars to be expended within five years of the date of plan approval.

B.    LaGen shall describe in the plans submitted to EPA for review and approval, how LaGen shall maintain the emissions avoided or reduced for the Projects it implements as part of the Solar PV Projects.

C.    The plan required to be submitted pursuant to this Section of this Appendix, shall also satisfy the following criteria:

1.    Describe how the proposed Projects in the plan are consistent with the requirements of this Section and the Consent Decree, and how the Projects will result in the emission reductions projected to be reduced  pursuant to this Section.

2.    Include a budget and schedule for completing each Solar PV Project on a phased schedule, and the supporting methodologies and calculations for the budget.

3.    Describe the methodology and include any calculations that LaGen proposes to use in order to document the emission reductions associated with any proposed Project to be implemented as part of this Section.

D.    Upon EPA's approval of the plan, LaGen shall complete the Solar PV Project according to the approved plan and schedule.

E.    Solar Photovoltaic (PV) Installations:  LaGen may install solar PV at local schools, government-owned facilities, or facilities owned by nonprofit groups.

1.    A PV Project will, at a minimum, consist of:

    (a)    The installation of solar panels at a single location with unobstructed solar access, an installed capacity of at least 10 kilowatts direct current, and annual generation which does not exceed the three year historical annual average electricity consumption of the building the project serves;

    (b)    An inverter, appropriately sized for the capacity of the solar panels installed at the location;

    (c)    The appropriate solar panel mounting equipment for the particular school, government-owned building, or building owned by nonprofit groups selected, *i.e.*, roof mount, carport mount or ground mount;

    (d)    Wiring, conduit, and associated switchgear and metering equipment required for interconnecting the solar generator to the host building and equipment required by the local utility for net metering; and

    (e)    Appropriate monitoring equipment supported by kiosk delivered educational software to enable building occupants and/or staff to monitor the total and hourly energy output of the system (kilowatt hours), environmental benefits delivered (pounds $CO_2$ avoided), hourly ambient temperature, irradiance (W/M2), as well as accumulative annual irradiance and benefits delivered.

2.    The PV Project will be connected to the customer side of the meter and ownership of the system will be conveyed to the building owner at the site;

3.    All related environmental benefits will be retained by the system owner, including associated Renewable Energy Credits or Renewable Resource Credits (collectively RECs);

4.    LaGen will include in its bid proposals the requirement that each PV System include a manufacturer parts warranty and a Project Service Contract, as described in Subsection IV.E.5, below;

5.    The plan will also include the requirement for: (a) a manufacturer parts warranty for the solar panels installed for 25 years and inverters installed for 10 years; and (b) funding of an escrow account which will provide annual distributions adequate for the host building to contract operation and maintenance service for 25 years from the date of installation including but not limited to, annual system checkups and solar module

cleaning, and normal Project component replacements, including installation of new system components as needed to maintain the Project through the termination of the contract term. LaGen may propose to purchase the Project Service Contract for the benefit of the entity that owns the building where the PV Project is installed (Service Contract Beneficiary) and to have the option of funding the cost of the Project Service Contract by depositing funds in an escrow account for use by such Service Contract Beneficiary solely for purposes of maintaining the PV Systems through the termination of the contract term; and

6.    In addition, LaGen's plan will:

    (a)    Include a schedule and budget for completing each phase of each Solar PV Project including installation and funding of the Project Service Contract for maintenance costs for 25 years following the approval of the plan;

    (b)    Describe the process that LaGen will use to notify the school districts, government buildings and not for profit building owners that they are eligible to participate in the Solar PV Project and solicit their participation in the Solar PV Project;

    (c)    Describe the process and criteria LaGen will use to select the schools, government buildings and/or not for profit buildings where the systems will be installed, including base electricity usage, solar access availability, and other relevant criteria;

    (d)    Identify any person or entity, other than LaGen, that will be involved in the Solar PV Projects. This does not include contractors or installers who would complete the siting analysis and/or installation of the PV systems but does include any proposed affiliate or third party who would have a coordination or project management role in the Solar PV Project;

    (e)    Identify the expected capacity (kilowatts-dc) and energy output of each system; and

    (f)    Provide that LaGen shall biannually report the actual kilowatt-hours generated each year in the progress report required by Paragraph 97 of the Consent Decree.

7.    In addition to the information required to be included in the report pursuant to Section I.G, above, LaGen shall include in that report the identity of the buildings where the PV systems are installed, the total capacity (kilowatts) of each system, components installed, total cost, and expected energy output and environmental benefits.

8.      Potential Projects:  The following projects are examples of Solar PV Projects contemplated under this Section V if implemented consistent with the requirements set forth above.

(a)      Installation and implementation of a Solar PV Project at a school in New Orleans serving a minority/low income population.

(b)      Installation and implementation of a Solar PV Project at a large government-owned building in South Louisiana serving an environmental justice community.

(c)      Implementation of green technology and use of Solar PV for lighting of a bridge connecting environmental justice communities.

(d)      Implementation of solar technology at government-owned buildings and parks in the New Roads community adjacent to the Big Cajun II facility.

## VI.    Additional United States Environmental Mitigation Project (Up to $500,000)

A.      LaGen may spend Project Dollars up to an amount not to exceed $500,000 on Energy Efficiency Projects for the reduction or avoidance of criteria pollutants.

B.      If LaGen elects to perform an Energy Efficiency Project, LaGen shall submit a plan to EPA for review and approval pursuant to Section XII of the Consent Decree (Review and Approval of Submittals).  LaGen shall describe in the plan submitted to EPA how LaGen shall achieve and maintain the emission reductions associated with the Energy Efficiency Projects.

C.      The plan required to be submitted pursuant to this Section of this Appendix shall also satisfy the following criteria:

1.      Describe how the proposed Projects in the plan are consistent with the requirements of this Section and the Consent Decree, and how the Projects will result in the emission reductions projected to be reduced pursuant to this Section.

2.      Include a budget and schedule for completing the Energy Efficiency Projects and the supporting methodologies and calculations for the budget.

3.      Describe the methodology and include any calculations that LaGen proposes to use in order to document the emission reductions associated with any proposed Project to be implemented as part of this Section.

E.      Upon EPA's approval of the plan, LaGen shall complete the projects according to the plan and schedule.

-74-

F.      For purposes of this Section VI, Energy Efficiency Projects include but are not limited to:

1.      <u>Voltage Optimization (Transmission Loss Reduction)</u>: LaGen may invest in one or more Projects to improve the end-to-end efficiency of the power delivery system through optimization of system voltages or other similar approaches. An example project would deploy advanced metering and control technology to provide real-time measurement and optimization of system voltages to reduce transmission line losses, and reduce consumer energy consumption. By optimizing distribution feeder voltages to the lower portion of the American National Standards Institute service range, energy savings are estimated to be 2-3% of the total energy delivered.

2.      <u>Residential Energy Efficiency</u>: LaGen may provide "Extreme Energy Makeovers" for communities of homes or residences located in Louisiana. This Project would retrofit a community of residences, such as low-income housing, with the most cost-effective energy-reduction packages on actual homes and monitor the results, with a goal to achieve 25% energy use reduction.

3.      <u>Commercial or Industrial Custom and Prescriptive Efficiency Assistance</u>: LaGen may provide incentives for commercial and/or industrial end-users to invest in energy efficiency improvements to such systems as lighting, heating and cooling, and other technologies (*e.g.*, refrigeration, food service, office equipment, etc.). LaGen may fund energy audits and expert consulting services to collaborate with businesses to develop energy efficiency improvement plans aimed at making commercial facilities (*e.g.*, schools, hospitals, office and government buildings, etc.) more energy efficient. LaGen may offer custom incentives for site specific improvements resulting in calculated or directly measured energy and demand reductions and will offer a menu of prescriptive incentives for specified, pre-approved types of efficiency upgrades to commercial and/or industrial building electric systems and equipment. Incentives will be structured to help commercial businesses shorten payback periods and move proposed projects to implementation.

## STATE OF LOUISIANA ENVIRONMENTAL MITIGATION PROJECTS

### VII.    <u>Mitigation Projects to be Conducted by the State of Louisiana ($1.5 million)</u>

A.      LaGen shall fund environmental mitigation projects submitted by the State of Louisiana consistent with the provisions of this Section VII. These projects are not subject to the requirements set forth in Section II above.

B.      The State of Louisiana shall submit to LaGen projects for funding in a total amount not to exceed $1.5 million over the period of five (5) years following the Date of Entry of this Consent Decree, beginning as early as July 1, 2013.

C.    LaGen shall pay the amounts designated by the State in accordance with the projects submitted for funding within seventy-five (75) days after being notified in writing by the State.  LaGen shall not be required to pay more than $500,000 in a single calendar year unless mutually agreed with the State.

D.    The State agrees to use money funded by LaGen to implement projects that pertain to energy efficiency, pollution reduction and/or pollution mitigation or restoration-related activities.  Such projects may include, but are not limited by, the following:

1.  Retrofitting land and marine vehicles (*e.g.*, automobiles, off-road and on-road construction and other vehicles, trains, or ferries) and transportation terminals and ports, with pollution control devices, such as particulate matter traps, computer chip reflashing, and battery hybrid technology;
2.  Truck-stop and marine port electrification;
3.  Purchase and installation of photo-voltaic cells on buildings;
4.  Projects to conserve energy use in new and existing buildings, including appliance efficiency improvement projects, weatherization projects, and projects intended to meet EPA's Green Building guidelines and/or the Leadership in Energy and Environmental Design (LEED) Green Building Rating System;
5.  "Buy back" programs for dirty old motors (*e.g.*, automobile, lawnmowers, landscape equipment); and
6.  Programs to remove and/or replace oil-fired home heating equipment to allow use of ultra-low sulfur oil, and outdoor wood-fired boilers.