# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| WASHINGTON-ST. TAMMANY ELECTRIC COOPERATIVE, INC., ET AL. | CIVIL ACTION |
|---|---|
| VERSUS | NO. 17-405-JWD-RLB |
| LOUISIANA GENERATING, L.L.C. | |

## ORDER

Before the Court is Plaintiffs' Motion to Compel Production of Certain Documents on Defendant's Privilege Log. (R. Doc. 83). The motion is opposed. (R. Doc. 103). Plaintiff filed a Reply. (R. Doc. 109) (under seal). Defendant filed a Sur-Reply. (R. Doc. 113). The parties also filed supplemental briefs. (R. Doc. 137, R. Doc. 138) (under seal).

## I.    Background

### A.    Factual Allegations

On June 28, 2017, Washington-St. Tammany Electric Cooperative, Inc. ("WST") and Claiborne Electric Cooperative, Inc. ("Claiborne") (collectively, "Plaintiffs" or the "Customer Cooperatives"), filed this breach of contract action against Louisiana Generating, L.L.C. ("Defendant" or "LaGen"). (R. Doc. 1, "Compl."). The Customer Cooperatives allege that they are non-profit electric cooperative corporations who obtain electric power from LaGen. (Compl. ¶¶ 1-4). The Customer Cooperatives seek a finding that LaGen breached certain Power Supply and Service Agreements ("Contracts")[1] by charging them for costs associated with LaGen's remediation of environmental conditions existing at the Big Cajun II power generating plant before the execution of the Contracts, as well as a declaration that LaGen may not assess such costs in the future. (Compl. ¶¶ 4-5). The Customer Cooperatives assert that in light of certain

---

[1] The Contracts are attached to the Complaint as Exhibits 1-4. (R. Docs. 1-1, 1-2, 1-3, 1-4).

Environmental Law Clauses in the Contracts, LaGen "has exclusive responsibility for the costs of complying with Environmental Laws existing prior to June 24, 2002, and also the costs of remediating environmental conditions that existed at the Big Cajun II power generating plant prior to June 24, 2002." (Compl. ¶¶ 7-10).

The Customer Cooperatives assert that LaGen has improperly assessed them with certain remediation costs incurred pursuant to a Consent Decree between LaGen and the Environmental Protection Agency ("EPA") and Louisiana Department of Environmental Quality ("LDEQ"). (Compl. ¶¶ 11-22). The federal action in which the Consent Decree was entered was brought by the EPA against LaGen on February 18, 2009 "pursuant to Sections 113(b) and 167 of the Clean Air Act ('the Act'), 42 U.S.C. § 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ('PSD') provisions of the Act, 42 U.S.C. §§ 7470-92; the federally approved Louisiana PSD regulations of the Louisiana State Implementation Plan ('SIP'); Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally approved Louisiana Title V program, or any rule or permit issued thereunder." *EPA v. Louisiana Generating*, Civil Action No. 09-100-JJB-RLB, ECF No. 1 at 1 (M.D. La. Feb. 18, 2009).[2] On March 5, 2013, the Court entered a Consent Decree providing, in pertinent part, the following:

> WHEREAS, the Settling Defendant affirms that a portion of the emissions technology, including related to PM emissions and refueling, under this consent decree, will allow it to comply with the Mercury [and] Air Toxics Rule, a change in environmental law promulgated after the filing of the complaint.

*Louisiana Generating*, ECF No. 427 at 4.[3] The Customer Cooperatives allege that "on the basis of this self-serving statement," LaGen has wrongly characterized remediation costs of past

---

[2] The EPA Complaint is attached to the Complaint as Exhibit 5. (R. Doc. 1-5).
[3] The Consent Decree is attached to the Complaint as Exhibit 6. (R. Doc. 1-6).

excess emissions of nitrous oxides ("NOx"), sulfur dioxide ("$SO_2$"), and particulate matter ("PM") as related to the 2011 Mercury and Air Toxics Standards ("MATS") Rule, as opposed to environmental laws in effect prior to the execution of the Contracts. (*See* Compl. ¶¶ 21-31).[4]

The Customer Cooperatives specifically contend that the following five categories of costs have been wrongly assessed by LaGen: (i) the boiler conversion of Unit 2 at LaGen's Big Cajun II power plan from coal to natural gas (including natural gas pipeline costs); (ii) the installation of PM continuous emission monitoring systems ("CEMS") on Units 1 and 3; (iii) "certain costs" associated with the ash handling collection systems; (iv) "certain costs" of electrostatic precipitator ("ESP") upgrades; and (v) "certain costs" that LaGen has identified as MATS chemical costs. (Compl. ¶¶ 27, 30, 34, 37).

The Customer Cooperatives assert that LaGen has wrongly assessed them with approximately $38.1 million between 2016 and 2025 in remediation costs. (Compl. ¶ 28). The Customer Cooperatives allege that "[o]f the approximately $38.1 million in costs that [they] dispute, approximately $10.4 million are capital costs, approximately $16.2 million are interest expenses, and approximately $11.5 million are operations and maintenance expenses." (Compl. ¶ 28). The Customer Cooperatives challenge LaGen's position that it "has appropriately allocated chemical costs between the Activated Carbon Injection system (a mercury control) and the dry sorbent injection ('DSI') and SNCR [Selective Non-Catalytic Reduction system] required by the Consent Decree." (Compl. ¶ 29). The Customer Cooperatives assert that they have "already suffered significant harm, paying more than $7.6 million in unjustified charges from July 2015 through May 2017." (Compl. ¶ 31).

---

[4] *See* National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 77 Fed. Reg. 9304 (Feb 16, 2012).

B.     **The Discovery Dispute**

Through the instant motion, the Customer Cooperatives assert that LaGen may have improperly withheld 29 emails as protected under the attorney-client privilege. The Customer Cooperatives have submitted a copy of LaGen's privilege log with the challenged entries highlighted. (R. Doc. 83-3). The Customer Cooperatives attempted to address the issues raised in the instant motion by sending a deficiency letter to LaGen on September 14, 2018. (R. Doc. 83-2). The Customer Cooperatives represent that LaGen "failed to respond" to the foregoing letter. (R. Doc. 83-1 at 1). The Customer Cooperatives do not indicate that any additional efforts were made to resolve the issues raised in the instant motion, which was filed on the deadline to complete written discovery, without court intervention.[5]

The Customer Cooperatives assert that 28 of the withheld emails involve "communications in which inside counsel, company employees, and individuals outside of the company all appeared on the distribution list." (R. Doc. 83-1 at 3). The Customer Cooperatives further assert that LaGen has not "adequately established" that the attorney-client privilege applies to these communications because LaGen's in-house counsel was "copied" to the emails, third-parties were included on the emails, or both. (R. Doc. 83-1 at 3-4). The Customer Cooperatives also challenge whether the attorney-client privilege applies to a particular email on which LaGen's in-house counsel was not a sender or recipient. (R. Doc. 83-1 at 5).

---

[5] Rule 37(a)(1) of the Federal Rules of Civil Procedure provides that any motion to compel "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Failure to comply with the meet and confer requirement may constitute sufficient reason to deny a motion to compel. *Shaw Grp. Inc. v. Zurich Am. Ins. Co.*, No. 12-257, 2014 WL 4373197, at *3 (M.D. La. Sept. 3, 2014); *see also Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, No. 11-633 (M.D. La. July 2, 2014) (denying motion to compel where defense counsel made a single attempt by email to meet and confer and did not do so in a good faith effort to resolve the dispute without court intervention). Assuming that the foregoing deficiency letter sent was the Customer Cooperatives' only effort to resolve the instant dispute without court action, the requirements of Rule 37(a)(1) has not been satisfied. Given the procedural posture of this action, however, the Court will consider the merits of the instant motion and consider the failure to comply with Rule 37(a)(1) for the purposes of awarding any costs.

In opposition, LaGen represents that after the filing of the instant motion, it produced four emails that were inadvertently included on its privilege log. (R. Doc. 103 at 4). LaGen opposes the production of the remaining 25 emails. LaGen asserts that 19 of the emails involve Sargent & Lundy ("S&L"), which should be considered LaGen's "representative" for the purposes of the attorney-client privilege in light of the professional consulting relationship between S&L and LaGen and its parent company, NRG Energy Inc. ("NRG"). (R. Doc. 103 at 4-8). LaGen further asserts that two of the emails involve Energy Plus Holdings LLC and Reliant Energy, which are also subsidiaries of S&L, and, therefore, remain confidential attorney-client communications. (R. Doc. 103 at 8-9). LaGen further asserts that two of the emails involve Southern Strategy Group of Louisiana ("SSG"), which should be considered LaGen's "representative" for the purposes of the attorney-client privilege because it "provides the same services that an in-house government affairs professional would provide." (R. Doc. 103 at 9-11). LaGen further asserts that one of the emails involves employees of Entergy, a co-owner of Unit 3 at LaGen's Big Cajun II facility, and that the communication is protected under the "common interest" privilege. (R. Doc. 103 at 11-12). Finally, LaGen asserts that one email involves William Sargent of Sargent Group, which should also be considered LaGen's "representative" for the purposes of the attorney-client privilege. (R. Doc. 103 at 12).

## II. Law and Analysis

### A. Legal Standards

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R.

Civ. P. 26(b)(5)(A). Blanket assertions of a privilege are unacceptable, and the court and other parties must be able to test the merits of a privilege claim. *United States v. El Paso Co.*, 682 F.2d 530, 541 (5th Cir. 1982) (citing *United States v. Davis,* 636 F.2d 1028, 1044 n. 20 (5th Cir. 1981)).

The attorney-client privilege protects communications, made in confidence, between the client and the attorney for the purpose of obtaining/giving legal advice, and the party invoking it has the burden of demonstrating each element of the privilege. *King v. University Healthcare System, L.C.*, 645 F.3d 713, 720 (5th Cir. 2011). "The attorney-client privilege exists to protect confidential communications and to protect the attorney-client relationship and is waived by disclosure of confidential communications to third parties." *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). Furthermore, "[w]hen confidential communications are made a material issue in a judicial proceeding, fairness demands treating the defense as a waiver of the privilege." *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989). "The great weight of authority holds that the attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Id.* (internal punctuation omitted).

Rule 26(b)(3) of the Federal Rules of Civil Procedure restricts a party's ability to obtain work product from an opponent during discovery. Work product consists of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The work product protection is broader in scope and reach than the attorney client privilege. The attorney-client privilege "extends only to client communications, while the work product protection encompasses much that has its source

6

outside client communications." *Stoffels v. SBC Communications, Inc*., 263 F.R.D. 406, 412 (S.D. Tex. 2009). Work product protections "are held by both the attorney as well as the client" and may be asserted and waived by either. *In re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009). Rule 26(b)(3) distinguishes between "ordinary" and "opinion" work product. The party seeking disclosure of opinion work product is subject to a higher burden because opinion work product reveals the "mental impressions, conclusions, opinions, or legal theories of an attorney." *Conoco Inc. v. Boh Brothers Constr. Co.*, 191 F.R.D. 107, 118 (quotations omitted). This protection is not absolute, however. Like the attorney client privilege, opinion work product may be disclosed when the holder waives the protection by placing the protected material "at issue" in the litigation. *Id.* at 118. The party seeking discovery of opinion work product must show a compelling need for the information and an inability to obtain it otherwise. Fed. R. Civ. P. 26(b)(3).

    **B.**    **Analysis**

Neither party disputes, for the purposes of this motion, that the emails at issue are relevant to a party's claim or defense and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). The sole issue is whether the 29 emails at issue were properly withheld on the privilege log on the basis of the attorney-client privilege.

    **1.**    **Six Emails No Longer in Dispute**

As stated above, LaGen has produced four of the emails at issue (CNTRL_00009204, CNTRL_00011563, CNTRL_00024044, and CNTRL_00024156). LaGen also withheld two emails involving Energy Plus Holdings LLC and Reliant Energy (CNTRL_00016879 and CNTRL_00019003). The Customer Cooperatives agree that there is no remaining dispute with respect to these six emails. (R. Doc. 109 at 1).

### 2. Nine Emails Withheld on Basis of Work Product Doctrine

LaGen withheld nine of the remaining emails pursuant to the work product doctrine (CNTRL_00011964, CNTRL_00012349, CNTRL_00012355, CNTRL_00012463, CNTRL_00012468, CNTRL_00012476, CNTRL_00016712, CNTRL_00022117, and CNTRL_00024042). In its opposition, LaGen again asserts that it has properly withheld these emails pursuant to the work product doctrine, and has not waived that protection by disclosure to third parties. (R. Doc. 103 at 5). Despite having been provided the opportunity to reply to LaGen's opposition, the Customer Cooperatives do not address LaGen's assertion of work product immunity. Accordingly, the Court will not require LaGen to produce any of these nine emails.[6]

### 3. Thirteen Emails Involving S&L

LaGen asserts that S&L should be considered its "representative" for the purposes of the attorney-client privilege. LaGen asserts that S&L personnel "are the functional equivalents of employees because their firm was retained to provide technical and regulatory compliance advice regarding LaGen's plan for compliance" with the MATS Rule and Consent Decree. (R. Doc. 103 at 5, 8). LaGen further asserts that S&L employees "had day-to-day involvement with LaGen concerning the development and implementation of the MATS compliance plan and the development and implementation of the Consent Decree projects . . . and [that] they possessed information and technical expertise that no one at LaGen possessed." (R. Doc. 103 at 5-6). In support of its assertion that S&L performs the functional equivalent of an in-house engineering department, LaGen submits a declaration by Ray D'Alesandro, NRG's Senior Director of Development Engineering and Construction. (R. Doc. 103-1).

---

[6] This renders moot the Customer Cooperatives' arguments with respect to emails involving Williams Sargent (CNTRL_00022117) and Entergy (CNTRL_00011964).

The Customer Cooperatives argue that communications involving S&L personnel should not be considered privileged because LaGen provided an expert report on February 1, 2019, from Kenneth J. Snell, an employee of S&L, offering opinions on this litigation. (R. Doc. 109 at 3). The Customer Cooperatives submit deposition testimony in which Mr. Snell asserts that he does not consider himself or any other employees of S&L to be the functional equivalent of LaGen employees. (R. Doc. 137). The Customer Cooperatives assert that LaGen should not be permitted to "withhold any information related to the claims in this suit that it provided to the firm of its testifying expert" and otherwise suggests that LaGen has selectively withheld documents involving S&L that are less favorable to its litigation position. (R. Doc. 109 at 3). Among other things, the Customer Cooperatives assert that LaGen has improperly "funneled through counsel" certain engineering studies and seeks *in camera* inspection of various emails related to engineering matters. (R. Doc. 109 at 4-6).

In response to the foregoing arguments, LaGen asserts that Mr. Snell's deposition testimony was taken out of context and lacks foundation (as Mr. Snell was not involved with work involving the MATS Rule and Consent Decree), that no documents listed on the privilege log involve Mr. Snell or were otherwise relied upon in the preparation of his report, and that the Customer Cooperatives' arguments do not otherwise undermine LaGen's assertions that S&L was its representative for the purposes of the attorney-client privilege. (R. Doc. 113; R. Doc. 138).

While the attorney-client privilege may be waived when the confidential communication is disclosed to third parties, "[w]hen agents or employees . . . participate as members of a team to provide information and documents to litigation counsel and to obtain from counsel answers to the client's questions, with the primary purpose of effectuating counsel's rendition of legal advice to the client, communications between the client's legal personnel and the third-party

9

agents are privileged, and the privilege is not waived by the communications." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, No. 13-373, 2018 WL 2323424, at *4 (M.D. La. May 22, 2018) (citations omitted); *see also In re Liprie*, 480 B.R. 658, 663 (Bankr. W.D. La. 2012) ("The privilege may also extend to a client's or attorney's representatives to the extent that the presence of those representatives furthers the provision of legal services to the client.") (citing *In re Bieter,* 16 F.3d 929, 936 (8th Cir. 1994); 24 Wright & Graham, Federal Practice and Procedure §§ 5482, 5483 (1986)).

Having considered the arguments of the parties, the Court finds that LaGen has established that S&L was its representative for the purpose of the attorney-client privilege to the extent it was retained to provide technical and regulatory compliance advice regarding LaGen's plan for compliance with the MATS Rule and Consent Decree. LaGen withheld 13 emails involving S&L solely on the basis of the attorney-client privilege (CNTRL_00011525, CNTRL_00011542, CNTRL_00012345, CNTRL_00012412, CNTRL_00012472, CNTRL_00012474, CNTRL_00012544, CNTRL_00012655, CNTRL_00012770, CNTRL_00013129, CNTRL_00013716, CNTRL_00013725, and CNTRL_00013781).[7] While the Customer Cooperatives have identified a couple of emails on which LaGen's counsel was copied, LaGen satisfactorily explains that the number of personnel on the emails merely reflects the scope of the underlying legal issues. (R. Doc. 113 at 3). The Court finds no basis for concluding that LaGen's assertion of privilege with respect to any of these communications involving counsel are improper.

One email withheld by LaGen involving an S&L employee and an NRG employee, however, does not involve counsel despite a description that it is a "[c]ommunication, with

---

[7] LaGen also withheld six emails involving S&L for which it asserted protection under the work product doctrine. (CNTRL_00012349, CNTRL_00012355, CNTRL_00012463, CNTRL_00012468, CNTRL_00012476, and CNTRL_00016712). These emails need not be produced for the reasons discussed above.

attachments, between NRG employee and in-house counsel, Gordon Polozola, Esq., providing information for the rending of legal advice regarding contract/agreement/amendment drafting." (R. Doc. 83-3). The Customer Cooperatives argue that this email must be produced because it clearly does not involve a communication involving LaGen's counsel. (R. Doc. 109 at 4). LaGen argues that the "email relates to and forwards (attaches) a communication" from LaGen's counsel "providing his comments on a document." (R. Doc. 113 at 2). LaGen has not demonstrated that the withheld communication involving an S&L employee and an NRG employee is privileged simply because it "relates to and forwards" a privileged communication. LaGen must produce the withheld email (CNTRL_00012412), but may redact/withhold the underlying privileged communication if attached to this document.

### 4. One Email Involving SSG

LaGen withheld a single email involving SSG solely on the basis of the attorney-client privilege (CNTRL_00013686).[8] This email was sent by LaGen's President, Jennifer Vosburg, to LaGen's counsel, other LaGen employees, and Brad Mitterndorg of SSG. LaGen withheld the email pursuant to the attorney-client privilege on the basis that it involves "[c]ommunications, with attachments, to attorney, Gordon Polozola, Esq., requesting legal advice regarding commercial law." (R. Doc. 83-3 at 18).

LaGen argues that the communication is privileged because SSG is a governmental affairs consultant and LaGen's "representative" for the purposes of the attorney-client privilege. (R. Doc. 103 at 9-11). LaGen submits a declaration by Ms. Vosburg explaining, among other things, that SSG is part of LaGen's strategic team for regulatory and legal matters, that SSG provides professional services to LaGen with respect to issues relating to energy policy, that it

---

[8] Another email involving SSG was withheld solely on the basis of the work product doctrine (CNTRL_00024042) and need not be produced for the reasons explained above.

assists in developing, executing, and implementing LaGen's relationship with the state's rural electric distribution cooperatives. (R. Doc. 103-5). LaGen asserts that "SSG provides the same services that an in-house government affairs professional would provide, and engages in the same interaction with LaGen's General Counsel, Mr. Polozola, that such an in-house professional would." (R. Doc. 103 at 10).

In response, the Customer Cooperatives argues that to the extent the underlying communication merely provides "public relations advice" then it is not entitled to protection. (R. Doc. 109 at 6-7). LaGen represents, however, that the specific communication at issue "does not include any advice from [SSG], but rather is a draft document containing the mental impressions and strategy of LaGen's President relating to the Consent Decree and MATS compliance." (R. Doc. 113 at 4). Given the nature of this communication, the Court finds the assertion of privilege to be proper. *See F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (finding communications shared with public relations and government affairs consultants to be privileged where the consultants were the functional equivalent of employees for the purposes of rendering legal advice

## III. Conclusion

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' Motion to Compel Production of Certain Documents on Defendant's Privilege Log. (R. Doc. 83) is **GRANTED IN PART and DENIED IN PART**. LaGen must produce the email (CNTRL_00012412) as detailed in this Order within **7 days** of the issuance of this Order. The parties shall bear their own costs.

Signed in Baton Rouge, Louisiana, on May 13, 2019.

RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE